NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections @ appellate.courts.state.ak.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| KEANE-ALEXANDER CRAWFORD, | Court of Appeals No. A-10855 |
| Appellant, | Trial Court No. 3AN-08-13715 CR |
| v. | O P I N I O N |
| STATE OF ALASKA, | |
| Appellee. | No. 2432 — October 31, 2014 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Eric A. Aarseth, Patrick McKay, Jack W. Smith, and Michael Spaan, Judges.

Appearances: Keane-Alexander Crawford, *in propria persona*, Seward, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and E. Smith, Superior Court Judge [*].

Judge MANNHEIMER.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Keane-Alexander Crawford was convicted of second-degree murder for shooting and killing his sister's fiancé, following a physical altercation between the two men. Crawford represented himself at trial, and he continues to represent himself in this appeal.

On appeal, Crawford contends that he was brought to trial outside the time limits of Alaska Criminal Rule 45 (Alaska's speedy trial rule), and in violation of the Sixth Amendment right to speedy trial, and that his conviction should therefore be reversed with prejudice. In the alternative, Crawford argues that he is entitled to a new trial on several bases.

Crawford contends that he is entitled to a new trial because his trial judge should have recused himself.

In addition, Crawford asserts that his trial was flawed because the trial judge improperly restricted his *voir dire* examination of prospective jurors, refused to enforce Crawford's subpoena for a prospective defense witness, made several erroneous evidentiary rulings, misinstructed the jurors on self-defense, and refused Crawford's request to instruct the jury on "defense of others".

Crawford also argues that the trial judge improperly denied his post-verdict motion for a new trial.

Finally, Crawford claims that he was unlawfully denied a fair opportunity to defend himself because he was indigent and the trial judge declined to provide Crawford with funds to hire an expert witness.

With respect to all but one of Crawford's claims of error, we conclude either that there was no error, or that the error Crawford has identified was harmless.

But with respect to Crawford's claim that he was entitled to public funds to hire an expert witness, even after he declined to be represented by a court-appointed attorney, we conclude that we should seek supplemental briefing on this claim. This

question is one of first impression in this state, it turns on issues of statutory construction and constitutional law, and Crawford is representing himself in this appeal. Even though Crawford has written a detailed and articulate brief, he is not trained in the law, and this Court believes that it would be fairer to Crawford — and to the future *pro se* litigants affected by our decision — to have attorneys brief both sides of this controversy. We therefore will solicit supplemental briefs from the parties and from the state's two criminal defense agencies, the Public Defender Agency and the Office of Public Advocacy.

*The procedural facts relating to Crawford's speedy trial claim, and an overview of our analysis of this claim*

Criminal Rule 45(c)(1) provides that a criminal defendant must be brought to trial within 120 days from the date they were served with the charging document, but Criminal Rule 45(d) exempts various types of delay from this 120-day calculation.

Crawford was arraigned and served with the charging documents on December 7, 2008, so the following day (December 8) was Day 1 of his Rule 45 calculation.

The Rule 45 clock ran for 30 days, until January 6, 2009, when Crawford filed motions for a change of venue and for special consideration due to his indigency and *pro se* status. The filing of those motions tolled the running of the speedy trial clock. *See* Criminal Rule 45(d)(1).

Crawford withdrew his motions on January 13th, but by that time there was an independent reason to toll the running of the speedy trial clock under Rule 45(d)(1): on January 8th, the superior court ordered Crawford to undergo a psychiatric examination to determine whether he was competent to represent himself.

The report from that psychiatric examination was filed with the trial court on January 29th, but the report was inconclusive because Crawford had refused to participate in the examination. The court therefore ordered a second psychiatric examination, and this issue remained undecided.

Moreover, Crawford filed several other motions on January 28th: motions for depositions of witnesses, to compel pre-trial discovery, to dismiss the indictment, and to sever the trials of the various charges against him — as well as renewed motions for a change of venue and for special consideration due to his indigency and *pro se* status.

While these motions were pending, Crawford filed a motion asking the trial court to order the Office of Public Advocacy to provide him with investigative assistance and with funds for expert witnesses. Crawford also asked the court to appoint private counsel for him. These motions became ripe for decision on February 25, 2009 (the day that Crawford filed his reply to the State's oppositions). This meant that the speedy trial clock would begin to run again 30 days later — on March 27th — unless the trial court ruled on the motions sooner. *See* Criminal Rule 45(d)(1).

The trial court ruled on the last of Crawford's motions on March 24th. However, the speedy trial clock remained tolled because the court had not yet ruled on the issue of whether Crawford was competent to represent himself. The court had received the report from the second psychiatric examination on March 11th — but, again, Crawford had declined to participate. So on March 25th, the court ordered a third psychiatric examination, and the speedy trial clock remained tolled.

The court received the report from the third psychiatric examination on April 16th. Based on that report, the court granted Crawford's request to represent himself on April 22nd.

With all pending motions resolved, the speedy trial clock began running the following day: April 23rd. This was Day 31 of the calculation.

Various pre-trial conferences and proceedings took place during the next several weeks, with the speedy trial clock running. The court set a final pre-trial conference for June 10th, and the court scheduled Crawford's trial for Monday, June 22, 2009.

June 22nd was 60 days after April 23rd (and April 23rd was Day 31). Thus, if Crawford's trial had begun on June 22nd, that would have been Day 91 for speedy trial purposes.

But on June 16, 2009, Crawford requested a five-day continuance of his trial. (Actually, Crawford's request amounted to a request for a seven-day continuance, because the scheduled trial date — June 22nd — was a Monday; the five days that Crawford was asking for would have ended on a Saturday.)

The court granted Crawford's request and rescheduled the trial for Monday, June 29th. This continuance stopped the running of the speedy trial clock at Day 85.

Then, on June 29th, Crawford asked the court for another continuance — or, in the alternative, dismissal of the charges against him — because he had not received all the pre-trial discovery he was entitled to. Thus, the speedy trial clock remained tolled at Day 85.

Three days later, on July 2nd, the trial court issued its ruling on the discovery question. The court found that the State had violated various pre-trial discovery orders, but the court found that the State's violations had not been willful. The court therefore denied Crawford's request to dismiss the charges, but the court granted Crawford's alternative request for a continuance of the trial. Specifically, the court ordered a month's continuance of the trial — until August 3, 2009.

On August 3rd (*i.e.*, the scheduled trial date), Crawford asked the court to grant him another continuance to prepare and file motions and to obtain expert witnesses.

Crawford agreed to delay his trial for three months — until November 2nd — for these purposes. The court granted Crawford's request.

However, on September 18th, Crawford informed the court that he was withdrawing his request for the remainder of this three-month continuance, and that he wished to go to trial as soon as possible. The court nevertheless maintained the November 2nd trial date.

On November 2nd, Crawford asked the court for public funds to transport various defense witnesses, including three young children. Crawford's motion led to hearings on the competency of the child witnesses. Crawford also filed a motion asking the court to issue compulsory process so that Crawford could have access to a child witness, T.B., the homicide victim's son.

Because of Crawford's motions, and the resulting proceedings on those motions, the speedy trial clock remained tolled at Day 85.

On November 9th, the trial court concluded that Crawford was not competent to represent himself, and the court appointed the Public Defender Agency to represent him.

Because the court had not yet ruled on one aspect of Crawford's November 2nd motions (specifically, the competency of the child witnesses), the speedy trial clock was still tolled. But, in addition, the court expressly tolled the speedy trial clock for another 30 days — over Crawford's objection — to allow the Public Defender Agency to determine if there was a conflict that would prevent the Agency from representing Crawford, and (if not) to allow time for an assistant public defender to prepare for Crawford's trial.

That same day (November 9th), Crawford petitioned this Court to review the trial court's ruling regarding Crawford's competency to represent himself. This petition for review independently tolled the running of the speedy trial clock — because,

until the issue of Crawford's competence to represent himself was resolved, the trial could not go forward.

On December 15, 2009, this Court granted Crawford's petition for review and overruled the trial court on the issue of Crawford's competence to represent himself. Crawford's case was returned to the superior court for trial, with the speedy trial clock still standing at Day 85.

Under *Sundberg v. State*, 667 P.2d 1268, 1270-71 (Alaska App. 1983), when a case is returned to the trial court following this Court's resolution of a petition for review, the trial court has a 30-day grace period to work the case back into its trial schedule. Crawford's case returned to the superior court on December 16, 2009 (the day after we issued our ruling on Crawford's petition for review), and Crawford's trial began 22 days later — on January 6, 2010.

In sum: On the day that Crawford's trial began, the speedy trial clock stood at Day 85. Crawford was therefore brought to trial within the time limits of Criminal Rule 45.

*Crawford's objections to the foregoing speedy trial analysis*

*(a) The time attributable to Crawford's request for a five-day continuance of trial on June 16, 2009*

Crawford's first objection to the foregoing analysis involves our conclusion that Crawford effectively waived seven days of time when, on June 16, 2009, he asked the trial court for a five-day continuance of his trial. Crawford argues that because he only asked for a five-day delay, it was improper to toll the running of Rule 45 for any greater length of time.

But as we explained earlier, Crawford's request for a five-day delay effectively amounted to a request for a seven-day delay. His trial was scheduled for Monday, June 22nd. The five days he asked for would have ended on Saturday the 27th, so the trial could not have started until Monday the 29th.

We further note that when Crawford requested the five-day continuance at the June 16th pre-trial conference, the trial court expressly told him that Rule 45 would be tolled for "one week". Crawford did not object to the trial court's characterization of the situation.

It is true that Crawford returned to court the next day and announced (1) that he was withdrawing his request for the five-day continuance, and (2) that he now wanted to go to trial as previously scheduled, on June 22nd. But the trial court explained that, because of Crawford's earlier request, the trial of another case had already been set for June 22nd, and Crawford's own trial had been rescheduled for June 29th. Thus, the court told Crawford, he had effectively "waived a week" of time under Rule 45.

We agree that, under these facts, the trial court was justified in holding Crawford to the rescheduled trial date. This conclusion rests on two principles.

The first principle — illustrated by our supreme court's decision in *Coffey v. State*, 585 P.2d 514 (Alaska 1978), and by our own decision in *State v. Jeske*, 823 P.2d 6 (Alaska App. 1991) — is that when a defendant rescinds a previous waiver of time under Rule 45 or a previous agreement to a continuance, the rescission does not take effect *ab initio*. Rather, the Rule 45 clock remains tolled until the defendant's change of mind is affirmatively communicated to the trial court. [1]

The second principle is that the speedy trial clock does not necessarily begin running again immediately upon a defendant's announcement that they wish to

---

[1]   *Coffey*, 585 P.2d at 520-21; *Jeske*, 823 P.2d at 9-10.

withdraw their earlier waiver or consent to a continuance. Rather, as we suggested in *Wardlow v. State*, 2 P.3d 1238 (Alaska App. 2000), if the trial court's schedule has been altered in reliance on the defendant's earlier waiver of time, the trial court would be "justified in adding several days to the Rule 45 calculation in order to work [the defendant's] case back into the trial calendar — or in telling [the defendant] that he would have to wait until the scheduled trial date". *Id.* at 1244.

We note that Criminal Rule 45(d)(2) speaks of the "period of delay *resulting from* ... [a] continuance granted at the timely request or with the consent of the defendant." When a defendant requests a continuance, and then later rescinds that request, the court may not be able to put the defendant's case back into the trial calendar in its original spot, and thus the defendant's request may result in a greater period of delay.

Compare our holdings in *Sundberg v. State*, 657 P.2d 843 (Alaska App. 1982), *as modified on rehearing*, 667 P.2d 1268, 1270 (Alaska App. 1983), and *Petersen v. State*, 838 P.2d 812, 815 (Alaska App. 1992).

In Crawford's case, when Crawford announced that he wished to rescind his earlier request for a continuance of his trial, the court explained that Crawford's June 22nd trial date had already been given to another case, and that Crawford would have to wait until the Monday after that — June 29th. Given the record here, the trial court's action was permissible under Criminal Rule 45(d)(2).

*(b) The time attributable to Crawford's request for a continuance of trial on June 29, 2009*

Crawford's next objection to our speedy trial analysis involves the trial court's response when, on June 29th, Crawford asked for a continuance of his trial — or, in the alternative, dismissal of the charges — because the State had failed to provide all of the required pre-trial discovery.

When Crawford asked for this continuance, he also asked the court to sanction the State for its discovery violations by charging the additional time against the State for purposes of Rule 45. Crawford argued that it was unfair to make him choose between his right to pre-trial discovery and his right to a speedy trial.

Following a series of hearings, the trial court ultimately agreed with Crawford that the State had violated its discovery obligations; but the court found that the State's violations had not been willful. The court concluded that the proper remedy for the discovery violations was a continuance of the trial until August 3, 2009 — but the continuance would be charged against Crawford, not the State. (The court recognized that if the delay was charged to the State, this would bring Crawford's case to the brink of dismissal under Rule 45(g).)

On appeal, Crawford claims that the trial court's action violated Criminal Rule 45(d)(2). Rule 45(d)(2) is the provision of the speedy trial rule that exempts periods of delay resulting from "continuance[s] granted at the timely request [of,] or with the consent of[,] the defendant".

The final sentence of this rule declares: "A defendant without counsel shall not be deemed to have consented to a continuance [for purposes of this rule] unless the defendant has been advised by the court of the right to a speedy trial under this rule[,] and of the effect of [the defendant's] consent [to the continuance]."

Crawford argues that, because he was representing himself, and because the trial court neglected to expressly inform him that his requested continuance (if granted) would toll the running of the speedy trial clock, any delay attributable to the requested continuance *had* to run against the State.

We reject Crawford's argument for two reasons.

First, the wording of Criminal Rule 45(d)(2), taken as a whole, actually suggests that the trial court was not required to affirmatively warn Crawford about the Rule 45 consequences of the continuance. The final sentence of Rule 45(d)(2) declares that an unrepresented defendant "shall not be deemed to have consented to a continuance" unless the court informs the defendant of the speedy trial consequences of their consent. But the *initial* sentence of Rule 45(d)(2) speaks of two different situations: situations where a continuance is granted "at the ... request" of the defendant, and situations where a continuance is granted "with the consent" of the defendant.

Comparing the wording of these two sentences, it appears that the drafters of Rule 45(d)(2) may have intended to draw a distinction between (1) situations where a defendant actively *seeks* a continuance, versus (2) situations where a defendant *acquiesces* in a continuance proposed by the government or by the court — and that the drafters intended the final sentence of the rule (the proviso that requires the court to specially advise unrepresented defendants) to apply only to the second type of situation.

In the present case, Crawford did not merely "consent" to the continuance. Instead, he affirmatively requested the continuance. Thus, the final sentence of Rule 45(d)(2) would not apply.

Second, even if the final sentence of Rule 45(d)(2) did apply to Crawford's situation, it was satisfied.

When Crawford made his motion to continue the trial on June 29, 2009, the trial court had already advised him several times of his right to a speedy trial under

– 11 –

2432

Rule 45. In particular, just a few days earlier, the court had advised Crawford that "the filing of a motion automatically tolls speedy trial time, regardless of its nature," and that Rule 45 might conceivably be tolled "for as much as 30 days after the [motion] becomes ripe [for decision]." At that time, Crawford assured the trial court that he was familiar with Criminal Rule 45. Even though the trial court may not have repeated this warning when Crawford moved for a continuance of the trial on June 29th, Crawford had been warned that any motion he filed would stop the Rule 45 clock.

Crawford also argues that his request for a continuance of the trial was conditioned on the court's agreeing to charge the delay against the State. But when the trial court ruled on Crawford's motion, and continued the trial until August 3rd, the court expressly told Crawford that this continuance would be charged against him — because the State's discovery violations were not willful, and because charging the time against the State would risk dismissal of the charges under Rule 45(g).

It is true that, in response to the trial court's ruling, Crawford filed a notice on July 9, 2009, stating that he did not consent to the tolling of Rule 45. But even though Crawford expressed his dissatisfaction with this portion of the trial court's ruling, Crawford did not actually rescind his request for a continuance of the trial, nor did he otherwise assert that he wanted to go to trial immediately, even though he was presumably unprepared because of the State's discovery violations. Thus, the trial court had no occasion to alter the newly scheduled trial date of August 3, 2009.

*(c) The trial court's decision to characterize Crawford's August 3rd pleading as a motion for reconsideration rather than a motion to dismiss on Rule 45 grounds*

On August 3, 2009 (the day set for trial), Crawford filed a motion to dismiss the charges against him. Crawford contended that the time for bringing him to trial under Criminal Rule 45 had expired three and a half weeks earlier — because (according to Crawford), when the court granted Crawford's request for a continuance of trial on July 2nd, that continuance should have been charged against the State, not against Crawford.

The trial court treated Crawford's motion as a motion for reconsideration of the court's earlier decision to charge the continuance against Crawford. In this appeal, Crawford argues his motion was, indeed, a motion to dismiss, and thus the trial court committed error when it recharacterized his motion.

This is a distinction without a true difference. No matter what Crawford's pleading was called, his underlying claim for relief was the same: the assertion that the 35-day delay of his trial from June 29th to August 3rd should have been charged to the State — either because it was the State's fault that the pre-trial discovery was incomplete, or because the trial court failed to expressly advise Crawford of the provisions of Rule 45(d)(2).

As the Missouri Court of Appeals observed in *State v. Moad*, 294 S.W.3d 83, 86 (Mo. App. 2009), "the character of a pleading is determined by its subject matter and not its designation." Here, the substance of Crawford's request for relief was his assertion that the trial court committed error when, earlier, the court ruled that the running of the speedy trial clock should be tolled from June 29th to August 3rd. No matter what label we affix to Crawford's pleading, this was the issue before the court.

Crawford fails to explain why the name attached to his request has any significance. And we have already explained why the trial court's ruling was proper.

In his motion of August 3rd, Crawford argued for the first time that he had a right to go to trial unprepared (because of the State's discovery violations), and thus it was improper for the court to delay Crawford's trial so that the State could cure those discovery violations, and so that Crawford would have time to analyze the newly disclosed information.

But as we explained earlier, Crawford did not make this argument when the trial court was first considering this matter, nor did Crawford make this argument even after the trial court announced its ruling in early July (*i.e.*, announced that Crawford's trial would be continued until August 3rd, but that Rule 45 would be tolled during this time). Nor did Crawford apprise the trial court that he did, indeed, wish to go to trial even though he knew that the State had not disclosed all of the information required by the discovery rules.

Instead, Crawford waited until the arrival of the new trial date (August 3rd), and then he filed a motion to dismiss in which he asserted that he would have preferred to go to trial in early July, even though the State had not completed its pre-trial discovery. This type of procedural maneuvering — accepting the benefit of a continuance granted at one's own request, and later arguing that the continuance was unnecessary or improper — is not allowed. *Compare Drake v. State*, 899 P.2d 1385, 1388-89 (Alaska App. 1995); *State v. Jeske*, 823 P.2d 6, 10 (Alaska App. 1991).

*(d) Whether the trial court should have allowed Crawford to withdraw his earlier consent to a delay of his trial from August 3rd to November 2nd*

On August 3rd (*i.e.*, the scheduled trial date), Crawford asked the court to grant him another continuance to prepare and file more motions, and to obtain expert witnesses. Crawford initially requested a continuance of 45 days, but the trial court told Crawford that a continuance of that length would create scheduling issues — and that if Crawford wanted the continuance, he would have to agree to a trial in early November. In response, Crawford told the court, "If ... the only kind of continuance I can get is three months, then that's what I'll take."

Ultimately, Crawford agreed to delay his trial until November 2nd, and the court granted the requested continuance.

But on September 18th, after the court denied Crawford's request for public funding to hire expert witnesses, Crawford informed the court that he now wanted to withdraw his consent to the remainder of the three-month continuance. Instead, Crawford asked the court for an immediate trial. The court declined to alter the November 2nd trial date.

On appeal, Crawford contends that the speedy trial clock should have started running again as soon as he notified the court that he wished to withdraw his consent to the remaining portion of the continuance. But Crawford had agreed to a November 2nd trial date, and the court had already scheduled his trial for that date.

The trial court informed Crawford at the outset that Crawford's request for a continuance created scheduling problems — and that if Crawford wanted a continuance of several weeks, the court would have to delay the trial for three months. Crawford initially told the court that he was fine with this; then, about seven weeks later, he changed his mind. But even though Crawford may have changed his mind about

– 15 –

delaying his trial until early November, there is nothing in the record to indicate that the court's scheduling problems had changed — nothing to indicate that Crawford's case could reasonably be inserted into the court's trial calendar before the scheduled date of November 2nd.

As we have already explained, when a defendant consents to a delay of trial, and then later withdraws their consent to the remainder of the delay, the court is not required to push all other cases off the trial calendar to accommodate the defendant's change of mind. Rather, the court is entitled to a reasonable amount of time to work the defendant's case back into its trial schedule — and, in practice, this may mean that the defendant must wait until the scheduled trial date.

On this record, Crawford has failed to show that the trial court abused its discretion in requiring Crawford to abide by the already scheduled trial date of November 2nd.

We also note that, even if the trial court abused its discretion when, on September 18th, the court rejected Crawford's request for an immediate trial, Crawford filed a motion 11 days later — on September 29th — that would have tolled the running of Rule 45 in any event. That motion was a request for public funds to cover the transportation and lodging of his defense witnesses, which included his three young children.

The court concluded that it could not resolve Crawford's motion without making a preliminary determination as to whether the three young children were competent to testify. Hearings on the children's competency took place between November 2nd and November 9th. Thus, Crawford's motion for public funding of his witness expenses did not become ripe for decision until November 9th — one week after the previously scheduled trial date of November 2nd.

*(e) The time attributable to the litigation of whether Crawford was competent to represent himself*

On November 9, 2009, the trial court concluded that Crawford was not competent to represent himself, so the court delayed the proceedings for 30 days to allow time for the Public Defender Agency (or the Office of Public Advocacy, if the Public Defender had a conflict) to select an attorney to represent Crawford, and to give this attorney time to prepare for trial. The trial court ruled that the speedy trial clock would be tolled during this time.

On appeal, Crawford argues that the trial court should not have tolled the running of Rule 45 during this 30-day period. But when a court concludes that a *pro se* defendant is incompetent to represent themself, and that an attorney must be appointed, we believe that a reasonable period of delay would be tolled under Rule 45 even if the defendant objects.

But in Crawford's case, this issue is moot — because, ten days after the trial court ruled that Crawford was not competent to represent himself, Crawford petitioned this Court to review the trial court's ruling. *See Crawford v. State*, Court of Appeals File No. A-10610. We granted Crawford's petition and, in an order issued on December 15, 2009, we reversed the trial court's ruling.

Under Criminal Rule 45(d)(1), the speedy trial clock is tolled for "period[s] of delay resulting from ... interlocutory appeals". Here, Crawford sought interlocutory review of the trial court's ruling that he was incompetent to proceed *pro se*, so the time that this Court took to consider and resolve Crawford's petition for review is attributable to the litigation of the competency issue in the trial court. We conclude that the speedy trial clock was tolled, not from the date that Crawford filed his petition (November 19, 2009), but rather from the date of the trial court's underlying ruling: November 9, 2009.

We previously addressed this same issue in an unpublished opinion: *Green v. State*, 1993 WL 13157158 (Alaska App. 1993). In *Green*, we ruled that when a defendant petitions us to review a trial court's decision, Rule 45 is tolled from the date of the challenged trial court decision (and not the later date when the defendant filed the petition for review). *Id*. at *4. We explained that, if we construed Rule 45 the other way (so that the speedy trial clock continued to run until the petition was filed), this would "artificially truncate[] the time available to seek appellate review" and would encourage "the hasty filing of ill-considered and ill-advised interlocutory appeals." *Id*. at *4 n. 3.

We continue to find the reasoning of *Green* convincing. We therefore conclude that, in Crawford's case, the speedy trial clock was tolled from November 9, 2009 (when the trial court found that Crawford was incompetent to represent himself) to December 15, 2009 (when this Court granted Crawford's petition for review and summarily reversed the trial court).

(Compare *Vail v. State*, 599 P.2d 1371, 1379-1380 (Alaska 1979), where the supreme court held that Rule 45 was tolled from the initial filing of the petition for review until the date the petition was decided. From the wording of the supreme court's decision, it appears that the court was not asked to decide the question of whether Rule 45 should also be tolled from the date of the disputed trial court decision. Rather, the issue litigated in *Vail* was whether petitions for review should be treated like trial court motions under Rule 45(d)(1), so that the speedy trial clock would automatically start running again after the supreme court had the petition under advisement for 30 days.)

*(f) Crawford's demand for immediate trial on December 21, 2009*

As explained in the preceding section, this Court decided Crawford's petition for review (and reversed the trial court's ruling on Crawford's competency to

represent himself) on Tuesday, December 15, 2009. Crawford's case returned to the trial court on the following day, December 16th.

Five days later, on Monday, December 21st, the trial court held its first hearing in Crawford's case following this Court's decision that Crawford should be allowed to represent himself.

At that December 21st hearing, the trial court discharged the attorney who had been appointed to represent Crawford (based on the trial court's earlier finding of incompetency), and then the court discussed when Crawford's trial should begin.

Crawford initially told the court that he wanted the court to hold one more pre-trial hearing, to make sure that all of his witnesses were properly subpoenaed in advance of the new trial date that the court would set, and to give Crawford a chance to secure standby counsel to help him at the trial. The trial court suggested that this pre-trial conference could be held on Monday, January 4th, and then Crawford's trial could begin the next day, January 5th.

Crawford did not immediately object to this schedule, but he told the court that he wanted the time to run against the State. A few minutes later, though, Crawford told the court that he demanded an immediate trial — a trial that would start "today" or "tomorrow", even if this meant not getting his witnesses prepared, and going to trial without standby counsel.

In response, the trial court informed Crawford that, given "the current availability of judges", the earliest that Crawford's trial could start would be the week of January 4th. The court then reiterated its intention to hold a final pre-trial conference on Monday the 4th, and to begin jury selection on Tuesday, January 5th.

In *Sundberg v. State*, 667 P.2d 1268, 1270 (Alaska App. 1983), this Court held that when a criminal case returns to the trial court following interlocutory review, Rule 45 will be tolled for a reasonable amount of time to allow the court and the parties

to work the case back into the court's trial calendar. We also stated that an extra 30 days would presumptively be reasonable. *Ibid.*; *see also Keller v. State*, 84 P.3d 1010, 1013 (Alaska App. 2004).

In Crawford's case, the trial court acknowledged the rule in *Sundberg*, but the court declared that it did not wish to delay Crawford's trial by 30 days. Instead, the court scheduled Crawford's trial for two weeks in the future.

All of this was taking place during the winter holiday season, and the court explicitly stated that its decision to set Crawford's trial for the week of January 4th was based on judge availability. This was a valid consideration under *Sundberg*, and we therefore conclude that the period of time between December 16, 2009 and January 5, 2010 is excluded from the Rule 45 calculation.

Crawford's trial did not begin on January 5th, but rather on January 6th. The extra day was due to the fact that, at the January 4th pre-trial conference, Crawford made an oral motion for the trial judge to recuse himself. The judge denied this motion but, under the provisions of AS 22.20.020(c), the judge's decision had to be reviewed by another judge before the proceedings could go forward. This review delayed Crawford's trial by one day.

Because this delay was attributable to Crawford's motion for recusal, this extra day is likewise excluded from the Rule 45 calculation.

*(g) Conclusion regarding Rule 45*

For the reasons explained here, we conclude that only 85 days elapsed under Criminal Rule 45 between the time that Crawford was served with the charging documents (December 7, 2008) and the beginning of his trial (January 6, 2010). Thus, Crawford was brought to trial within the time limits of Rule 45.

– 20 –                                                    2432

*Crawford's speedy trial claim under the Sixth Amendment*

In addition to his Rule 45 speedy trial claim, Crawford also argues that his right to a speedy trial under the Sixth Amendment was violated.

As this Court acknowledged in *Alvarez v. Ketchikan Gateway Borough*, 91 P.3d 289, 294 (Alaska App. 2004), there may be rare instances where, even though a defendant is brought to trial within the time limits of Rule 45, the delay in holding the defendant's trial still may have prejudiced the defendant to such an extent that the defendant's Sixth Amendment right to a speedy trial is violated. [2]

In *Alvarez*, we pointed out that the Alaska Supreme Court has held that an unexplained trial delay of 14 months or more is presumptively prejudicial, [3] while a delay of eight months or less is presumed to be non-prejudicial. [4] But in applying these rules, a court must exclude any periods of delay caused by the defendant. [5]

Approximately 13 months elapsed between Crawford's arraignment in early December 2008 and the beginning of his trial in early January 2010. However, more than half of this delay was attributable to Crawford's various pre-trial motions and his petition for review. When the delays attributable to Crawford are subtracted from the total, only about six months of delay can be attributed to the State.

---

[2] Citing *Deacon v. State*, 575 P.2d 1225, 1229 (Alaska 1978).

[3] *Alvarez*, 91 P.3d at 294-95, citing *Rutherford v. State*, 486 P.2d 946, 951-52 (Alaska 1971), and *Glasgow v. State*, 469 P.2d 682, 688-89 (Alaska 1970).

[4] *Id.* at 295, citing *Nickerson v. State*, 492 P.2d 118, 120 (Alaska 1971), and *Tarnef v. State*, 492 P.2d 109, 112-13 (Alaska 1971).

[5] *Ibid.*, citing *Rutherford*, 486 P.2d at 952 n. 15, and *Springer v. State*, 666 P.2d 431, 435 (Alaska App. 1983).

As we noted earlier, a delay of eight months or less is presumptively non-prejudicial. Thus, to prevail on his Sixth Amendment claim, Crawford must show that he was actually prejudiced by the six-month delay.

Crawford asserts that he suffered three kinds of prejudice. First, he argues that the delay kept him incarcerated, and away from his family, for 13 months. But we rejected this type of argument in *Alvarez*. The defendant in *Alvarez* argued that her pending case had caused her stress and had disrupted her life. [6] This Court held that, even if this claim was true, it did not entitle Alvarez to relief under the Sixth Amendment, in the absence of any showing that it prejudiced her defense. [7] Like the defendant in *Alvarez*, Crawford makes no showing as to how his separation from his family actually prejudiced his defense.

Crawford next argues that, during the delay, he was incarcerated and had no access to investigative or expert services. But though Crawford's *incarceration* may have hindered his access to investigators and expert witnesses, the *delay* did not hinder him.

Third and finally, Crawford argues that, because of the delay, some witnesses' memories were "greatly dimmed".

Crawford offers two witnesses as examples of memory loss. But one of these witnesses had difficulty remembering the details about the incident when he testified to the grand jury just two weeks after the shooting.

Although the second witness testified at trial that she could not remember if the homicide victim tried to strangle Crawford before Crawford shot him, there is no indication in the record that this witness had any such memory at any earlier time. And

---

[6] *Alvarez*, 91 P.3d at 295.

[7] *Ibid.*

if, when the witness said that she could not remember the purported strangling, she was actually saying that she was *unaware* of this aspect of the occurrence, then this would not prove a loss of memory. The record does not otherwise show that the witness was ever aware of this purported happening.

In short, Crawford has not shown that he suffered actual prejudice from the approximately six months of delay that was not attributable to him. For these reasons, we reject Crawford's Sixth Amendment claim.

*The superior court's refusal to enforce the subpoena for Trevon Brown*

Crawford wished to call Trevon Brown to testify at his trial. Trevon was the ten-year-old child of the homicide victim and Crawford's sister, Kerri Nichols. (He was thus Crawford's nephew.) Trevon was present in the apartment on the night of the homicide, and he gave a statement to the police about what he saw and heard.

A subpoena was issued for Trevon, which the state troopers served on his mother, Kerri Nichols — but Nichols refused to accept the subpoena, and she also refused to reveal Trevon's location, other than to assert that her son was out of state for the duration of Crawford's trial. Nichols told Crawford's standby counsel she did not intend to bring Trevon to court.

When Crawford insisted that Trevon should testify, the trial judge held a hearing for the express purpose of ascertaining "any concerns that Ms. Nichols might have regarding Trevon Brown testifying", and to "explor[e] ... the idea of telephonic testimony".

At this hearing, Nichols testified that she believed it would be frightening and traumatic for Trevon to appear as a witness at Crawford's trial. When the judge

asked Nichols if it might be easier for Trevon to testify by telephone, Nichols replied, "I think my preference would still be that he just be left alone." She then added:

> *Nichols*: Reliving [the homicide] is going to be traumatic, horribly. You know, given those two options [of appearing in person or appearing telephonically], if I had to pick one — well, of course, he doesn't want to actually be here and see the person that killed his daddy. I just — that's — I don't know.

Crawford told the court that he believed Trevon was still in Alaska, and that Nichols was preventing Trevon from testifying because she believed he might not back up her version of events on the night of the shooting. Crawford also called Nichols's adoptive father to testify concerning Nichols's character for untruthfulness.

Based on the testimony at the hearing, the trial judge found that Nichols knew where Trevon was, and that she had the ability to produce him as a witness. Nevertheless, the judge decided not to compel Nichols to disclose Trevon's location. The judge stated that he was unsure whether he had the authority to make Nichols disclose this information, and the judge also stated that he did not want to put Nichols in a position where, by hiding Trevon's whereabouts, she would be committing a crime. The judge also worried that Nichols might have already committed the crime of witness tampering,[8] by sending Trevon out of state after the troopers served the subpoena.

The judge further declared that he did not intend to threaten Nichols with contempt. He stated that he found the prospect of incarcerating Nichols if she refused to cooperate "distasteful", and he added that he saw nothing to make him believe that Nichols was motivated by "anything other than the best interests of the child."

---

[8] *See* AS 11.56.540(a)(2).

The judge also stated that Crawford had failed to suggest any reason to believe that Trevon's testimony would differ from what was contained in his statement to the police. And the judge suggested that Trevon might not be competent to testify, even if he was subpoenaed.

For all of these reasons, the trial judge ruled that Trevon was "unavailable" as a witness for purposes of Alaska Evidence Rule 804(a).

Crawford immediately objected to the judge's decision. Crawford argued that the judge was engaging in unfounded speculation when he assumed (for purposes of his ruling) that Nichols would refuse to disclose Trevon's whereabouts, even if the court directly ordered her to do so, and when he assumed that Trevon would be unable or unwilling to testify, even if Trevon was subpoenaed and brought to court.

The trial judge agreed with Crawford that the situation was uncertain — but the judge declared that it was precisely these uncertainties that had convinced him not to threaten Nichols with contempt for failing to disclose Trevon's whereabouts.

The judge committed error in his handling of this situation.

A criminal defendant has the right to have a court issue, and enforce, compulsory process to obtain any witness's testimony (unless the witness has a privilege not to testify). [9] Here, the witness was a young child, under the legal and physical control of his mother. Nichols, the witness's mother, had been served with a subpoena for her son, but she refused to accept the subpoena, and she openly declared that she did not wish to produce Trevon to testify at Crawford's trial.

The trial judge refused to order Nichols to disclose her son's whereabouts — in part because the judge felt that it would be "distasteful" if he had to hold Nichols

---

[9] *See* the Sixth Amendment to the United States Constitution and Article I, Section 11 of the Alaska Constitution.

in contempt for refusing to answer. But that issue never arose, because the judge declined to take even the preliminary step of directing her to answer. We agree with Crawford that it was complete speculation for the judge to assume that Nichols would disobey a direct order to disclose her son's whereabouts.

The trial judge also stated that he did not wish to question Nichols about Trevon's whereabouts because, in answering these questions, Nichols might reveal that she had already engaged in witness tampering. But the fact that Nichols might have committed a crime in her efforts to defeat Crawford's right of compulsory process was hardly a justification for the judge's refusal to take steps to enforce Crawford's right.

Compare *Smiloff v. State*, 439 P.2d 772, 776 (Alaska 1968), where the supreme court held that a trial judge committed error by refusing to issue a subpoena for a potential eyewitness, based on the judge's speculation that the witness might have to be advised of their right against self-incrimination.

Finally, it was complete speculation for the judge to assume that Trevon would refuse to testify, or would be found incompetent to testify, if he was brought to court.

In sum, Crawford was entitled to have the superior court at least try to enforce his right to compulsory process. It is possible that the superior court's efforts might have led to an uncomfortable confrontation with Kerri Nichols. But given Crawford's right to Trevon's testimony, and given Nichols's refusal to disclose her son's whereabouts, it was the court's duty to engage in that confrontation.

We can not know if judicial efforts to procure Trevon's attendance at trial would ultimately have proved successful. But the judge was required to take reasonable steps to try to enforce the subpoena — and he failed to do so.

*The superior court's rulings that (1) Trevon Brown was "unavailable" as a witness, as defined in Evidence Rule 804(a), but that (2) Trevon's hearsay statements were not admissible under Evidence Rule 804(b)*

As we have explained, when the judge refused to enforce the subpoena for Trevon, he tried to lessen the impact of his ruling by declaring that Trevon was "unavailable" as defined in Evidence Rule 804(a)(5) — thus potentially allowing the parties to introduce some of Trevon's hearsay statements under the provisions of Evidence Rule 804(b).

The judge's action appears to have been prompted by the State. In both its pre-trial pleadings and in its argument to the trial judge on this issue, the State took the position that if the judge ruled that Trevon was unavailable as a witness, then Crawford would be able to introduce Trevon's pre-trial statements to the police under the residual hearsay exception codified in Evidence Rule 804(b)(5).

We conclude that the judge committed error when he declared that Trevon was "unavailable" for purposes of Evidence Rule 804.

Evidence Rule 804(a)(5) declares that a witness is "unavailable" if the witness is absent and "the proponent of the [witness's] statement has been unable to procure the [witness's] attendance ... by reasonable means[,] including process." Although this language, if read literally, might be construed to cover the situation presented here, we doubt that the framers of the rule intended to vest judges with the power to *make* witnesses unavailable simply by refusing to enforce a lawful subpoena, or by refusing to employ other reasonable means of procuring the witness's presence.

This error was compounded later, at Crawford's trial, when the State reversed its position and *opposed* Crawford's attempt to introduce a portion of Trevon's pre-trial statement under Evidence Rule 804(b)(5).

In his out-of-court statement, Trevon told the police that Crawford and the victim, Anthony Brown (Trevon's father) were in a room together, and Brown asked Crawford to leave the house. Trevon stated that Crawford began screaming to his children to put their coats on, because they were leaving, and then Brown "got all angry, and [that's] when he said all that stuff."

When Crawford asked to introduce this evidence under Rule 804(b)(5), the State opposed the admission of Trevon's statement — arguing that the residual hearsay exception in Rule 804(b)(5) was to be used only in exceptional cases, and that Trevon's statement was not more probative than the other available evidence on the point for which it was offered, since several other witnesses were available to testify about what was going on in the room at that time. In particular, the prosecutor argued:

> *Prosecutor*: We have all these other folks [who] were actually in the room that [have made] statements about what was going on in the room. Now, I understand that Mr. Crawford doesn't like what they're saying, but those are the other statements.

The trial judge ultimately precluded Crawford from introducing Trevon's out-of-court statement. The judge explained his ruling this way:

> *The Court*: [Trevon] was in [an adjoining] room, unable to see what was going on in the other room. Mr. Crawford is offering [Trevon's statement] basically to try to establish [the] timing ... of certain events, and [Trevon] would never be able to do that because [he] ... wasn't even there to be able to see it. [It is apparently undisputed that], at some point in time, Mr. Crawford was told ... to leave the house. The question is *when* that happened. Trevon Brown's statement to the police is not probative on that point. I[t] can't establish the timing, so ... I'm denying [Crawford's] application [to introduce this evidence].

This ruling was error. Trevon's statement to the police, if believed, supported an inference that the altercation between Crawford and Brown took place right after Crawford yelled at his three children to get ready to leave the house. The trial judge's analysis does not address whether there was other, more probative evidence available to prove this point. Rather, the judge concluded that Trevon's statement *could not be relevant* on this point, because Trevon only heard the altercation through a wall.

The fact that Trevon only heard the altercation through the wall, rather than observing it visually, was a fact that might affect the weight of the proposed evidence, but not its relevance. People who hear things happen (rather than see them happen) can still testify about the *timing* of those events.

Moreover, if (as Crawford suggests) the sequence of events described by Trevon was different from the sequence described by the other witnesses, this fact established that his out-of-court statement was the most probative available evidence on the point for which it was offered — because Crawford was trying to prove that the other witnesses had not described the timing of events accurately. Assuming there was, indeed, no more probative evidence available on this particular point, then — given the trial judge's earlier mistaken ruling that Trevon was "unavailable" for purposes of Evidence Rule 804 — the judge should have admitted the evidence and allowed the jury to decide what weight to give it.

*Whether the trial judge's mistaken rulings concerning Trevon Brown require the reversal of Crawford's convictions*

Our next task is to determine whether the trial court's erroneous rulings with respect to Trevon Brown require the reversal of Crawford's convictions. For this purpose, we will assume that the trial judge violated Crawford's constitutional right of

compulsory process when the judge failed to take steps to enforce Trevon's trial subpoena.  Thus, the test is whether the error is harmless beyond a reasonable doubt.

With regard to the timing of the events leading up to Crawford's shooting of Brown, several witnesses gave testimony concerning these events.

Kerri Nichols initially testified that, after Crawford yelled for his children to get ready to leave the house, Brown accused Crawford of going for his gun, and then Brown pushed Crawford down onto a couch.  But later in her testimony, Nichols gave a slightly different version:  she said that Brown did not push Crawford onto the couch until later , after Crawford started to talk about "mind control".

Another witness, Darryl Nicholson, testified that Brown tackled Crawford onto the couch, but Nicholson did not remember Crawford telling his children to get ready to go, nor did he remember many other details of the incident.

Crawford's wife, Marie Huesties, testified that Crawford yelled at the children to get ready, and she then left the room to help them.  Huesties said that she could then hear Kerri Nichols screaming at Brown to stop, and telling Brown that she did not want the children to "see [Crawford] like that".

Crawford himself testified that he was trying to talk to his sister (Nichols) about things that had happened when they were children, and that Brown interrupted and told him to "shut [his] fucking mouth", and then Nichols yelled at Brown to stop.  Crawford testified that Brown walked outside, but then Brown came back into the house and he (Crawford) could sense that something was different — and that was when he yelled at his children to get ready to leave.

Crawford testified that the next thing he remembered was Brown hitting him, and he fell back onto the couch, and then Brown choked him until he was unconscious.  Crawford said he could hear Nichols yelling at Brown, and that he saw Nichols trying to pull Brown off.

Crawford's oldest son, Kenneth, testified that he came out of a bedroom and saw Brown choking Crawford, while Nichols was screaming and trying to get Brown off of Crawford.

Arguably, Huesties's and Crawford's testimony — that the altercation occurred soon after Crawford yelled at his children to get ready to leave — was more probative than the testimony that Trevon could have offered, because Trevon was not in the room with Crawford, Brown, and Nichols, and he only reported what he heard through the wall. But Huesties and Crawford had a significant motive to portray events in the light most favorable to Crawford, while Trevon did not. (Trevon's father was the one who was killed.) So on this particular point, Trevon's testimony was arguably more probative than Huesties's and Crawford's testimony.

Even so, it is difficult to see how the absence of Trevon's testimony might have influenced the jury's verdict.

Crawford's defense was that, when he shot Brown, he acted in self-defense and in a state of mental confusion because Brown had strangled him. The precise timing of the events we have been discussing — in particular, whether Brown became angry at Crawford after Crawford yelled to his children to put their coats on — was not important to Crawford's claim of self-defense. Rather, the critical component of Crawford's self-defense claim was his assertion that Brown strangled him to the point of unconsciousness, thus causing him to react in a mental haze.

Trevon was not in the living room with Crawford and Brown, and there is nothing in the record to indicate that Trevon would have been able to testify as to whether Brown did in fact strangle Crawford, and whether (as Crawford claimed) this strangulation brought Crawford to the point of unconsciousness.

Potentially, Trevon's testimony might have undermined Kerri Nichols's credibility as a witness; but this, too, seems doubtful. Trevon's description of what he

heard through the wall can easily be reconciled with Nichols's initial testimony that, right after Crawford yelled at his children to get ready to leave, Brown accused Crawford of pulling a gun, and then he pushed Crawford down onto the couch.

We conclude that there is no reasonable possibility that the absence of Trevon's testimony affected the jury's decision in this case. Thus, the trial court's various errors with respect to this matter do not require reversal of Crawford's convictions.

*The superior court's ruling that limited Crawford's direct examination of two witnesses who were recalled to the stand during the defense case*

During the defense case, Crawford called two witnesses — Kerri Nichols and Darryl Nicholson — who had already testified during the State's case-in-chief.

During his direct examination of Kerri Nichols, Crawford sought to question her on topics that were within the scope of the prosecutor's earlier direct examination (when Nichols testified during the State's case). Crawford wanted to ask Nichols these questions because, by his own admission, he had forgotten to ask these questions during his earlier cross-examination of Nichols.

The trial judge ruled that, because Nichols and Nicholson had both already testified during the State's case, and because Crawford had already had the opportunity to cross-examine these two witnesses on the topics covered during their earlier direct examination by the prosecutor, it would now be improper for Crawford to ask Nichols or Nicholson questions on any topic within the scope of their earlier direct examination. The judge limited Crawford's direct examination of these two witnesses to topics that either were new, or that arose only during their earlier *redirect* examination.

The judge then invited Crawford to outline the specific questions that he wished to ask Nichols (the witness Crawford was examining at the time).

With respect to most of Crawford's proposed questions, either the judge indicated that the questions were proper, or the prosecutor stated that he had no objection. However, the judge refused to let Crawford question Nichols regarding certain topics. In particular, the judge told Crawford that the following questions were within the scope of Nichols's earlier direct examination, and that it would therefore be improper for Crawford to:

- seek to elicit Nichols's admission that, when the police interviewed her, she did not volunteer the information that Crawford was walking toward her while he was shooting — that Nichols only made this statement in response to an officer directly asking her, "Was he coming towards you?"

- question Nichols concerning the grand jury testimony that she yelled at Nicholson to call 911; according to Crawford, this testimony was relevant to prove *Nicholson's* state of mind, by suggesting that Nicholson might have consciously hesitated to call 911, and that he might have had some motive for failing to do so immediately.

- question Nichols about why she was "stressed out" that Crawford and his family were coming over to her house on the night of the shooting.

In addition, the trial judge limited Crawford's direct examination of the second witness, Darryl Nicholson, in one respect.

This issue arose because, during Crawford's earlier cross-examination of Nicholson (during the State's case), Crawford questioned Nicholson about some apparent inconsistencies between his statements to the police, his grand jury testimony, and his testimony on direct examination at trial — inconsistencies as to (1) whether Crawford pulled out his gun before or after Brown tackled him, and (2) Brown's reasons

– 33 –                                                                                  2432

for walking outside just as Crawford was leaving the house. When Crawford cross-examined Nicholson about these inconsistencies, Nicholson attributed them to his intoxication on the night of the shooting. Afterwards, the prosecutor asked Nicholson (during redirect examination) if he had a tendency to embellish things when he was intoxicated, and Nicholson said "yes."

When Crawford called Nicholson as a witness during the defense case, Crawford asked him a series of questions about this assertion that he embellished things when he was intoxicated. The prosecutor did not object to any of these questions, but the trial judge cut Crawford off, *sua sponte*. The judge mistakenly declared that Crawford's questions were "beyond the scope of the redirect." Crawford, however, did not challenge the trial judge's ruling, or point out that his questions were squarely related to testimony that Nicholson gave on redirect examination. Instead, Crawford moved on to a different topic.

On appeal, the State attempts to justify these limitations on Crawford's examination of the two witnesses by pointing out that judges have considerable discretion to order and restrict the presentation of evidence to prevent litigants from repeatedly questioning witnesses regarding topics on which they have already been questioned. [10]

It is true that trial judges have substantial discretion "to preclude repetitive and unduly harassing interrogation." *Marron v. Stromstad*, 123 P.3d 992, 1010 (Alaska

---

[10] See Alaska Evidence Rule 403, which authorizes judges to exclude relevant evidence "if its probative value is outweighed by ... considerations of undue delay, waste of time, or needless presentation of cumulative evidence", and Alaska Evidence Rule 611(a), which requires judges to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

2005). But here, the trial judge did not simply forbid Crawford from *repeating* questions he had earlier put to Nichols and Nicholson on cross-examination (when they testified during the State's case-in-chief). Rather, the judge prohibited Crawford from asking questions on topics that he *might have raised* (but did not) when he cross-examined the witnesses earlier.

The judge did not find that Crawford's proposed questions were irrelevant, improper, misleading, repetitive, harassing, or the like. Rather, the judge relied solely on the theory that Crawford had somehow forfeited his right to ask these questions because he neglected to take advantage of an earlier opportunity to raise these topics when he cross-examined the witnesses during the State's case. This forfeiture theory has no basis in law.

Nevertheless, we conclude that these errors were harmless. With respect to the specific questions that Crawford unsuccessfully sought to ask Nichols, these questions did not concern issues that were central to the case, and they had no significant impeachment value. Indeed, one of Crawford's proposed questions (Crawford's attempt to elicit testimony that Nichols yelled at Nicholson to call 911) appears to have been aimed at a completely speculative purpose. And with respect to Nicholson's inconsistent statements, his self-admitted tendency to "embellish" when he was intoxicated, and his level of intoxication at the time in question, Crawford was able to apprise the jury of these things, both in his cross-examination of Nicholson during the State's case-in-chief and in his direct examination of Nicholson during the defense case (before the trial judge cut him off).

For these reasons, we conclude that the trial judge's erroneous rulings did not rise to the level of infringing Crawford's right of confrontation, nor did these rulings appreciably affect the verdict.

*The superior court's refusal to allow Crawford to introduce certain evidence to impeach Nichols and Nicholson*

Crawford proposed to impeach Kerri Nichols by presenting the testimony of Nichols's adoptive father, Martin Nichols. According to Crawford, the senior Nichols would testify that Kerri had a character trait for creating conflict. Crawford argued that this character evidence was relevant to support Crawford's theory that Kerri had knowingly invited Crawford and Brown to her home for the purpose of orchestrating the conflict that led to the homicide.

The trial judge ruled that the proposed evidence was not admissible under Evidence Rule 608(a), which states that the credibility of a witness may be attacked by opinion evidence, but only when that opinion refers to the witness's character for truthfulness or untruthfulness.

Arguably, Crawford was offering Martin Nichols's testimony for a different purpose: not to attack Kerri's credibility as a witness, but rather to establish her actions on the night of the homicide (her alleged plan to bring Crawford and Brown together so that a conflict would erupt). But if the proposed character evidence was offered for this purpose, it was barred by Evidence Rule 404(a). Rule 404(a) codifies the general principle that evidence of a person's character is not admissible if it is offered as circumstantial evidence to prove that the person acted true to character on a particular occasion.

Moreover, as the prosecutor pointed out when he opposed this evidence, even if it was true that Kerri Nichols invited Crawford and Brown to her home in hopes that they would argue or fight, this was not relevant to the central issue litigated at Crawford's trial: whether Crawford acted in self-defense when he shot Brown.

For these reasons, we uphold the trial judge's decision to preclude this evidence.

With respect to Crawford's proposed impeachment of Darryl Nicholson, Crawford wished to impeach Nicholson by playing the video recording of Nicholson's interview with the police shortly after the homicide; Crawford asserted that this video would show that Nicholson was not as intoxicated at the time of the homicide as he claimed.

Before ruling on Crawford's request, the trial judge reviewed the video. Based on this review, the trial judge concluded that the video would provide a misleading view of Nicholson's level of intoxication, because Nicholson was sitting down for most of the interview (thus saving him from having to stand and maintain his balance). The judge also concluded that the video recording was not good enough to allow the jurors to assess the two main indicia of intoxication that the police interviewer relied on when he asserted that Nicholson was intoxicated: Nicholson's watery, bloodshot eyes and his odor of alcohol. In addition, the judge concluded that it would be difficult for the jurors to disregard the *content* of the statements Nicholson made on the video, and to focus solely on the indicia of Nicholson's sobriety or intoxication.

These were all reasonable concerns, and we therefore conclude that the judge did not abuse his discretion when he refused to allow Crawford to play the video for this purpose.

Crawford also asked the trial judge to let him impeach Nicholson in another fashion — by introducing evidence that, eleven years before, Nicholson's ex-wife had accused him of both physically and sexually assaulting her. Crawford argued that this evidence was relevant to show that Nicholson was "capable of ... perverted criminal acts" — thus supporting Crawford's theory that, on the night of the homicide, Nicholson

instructed Brown to attack and restrain Crawford so that he (Nicholson) could then sexually assault Crawford's children.

Alaska Evidence Rule 404(b)(1) bars the admission of evidence of a person's other bad acts when the evidence is offered to prove (1) that the person characteristically engages in bad acts of that type, and (2) that the person therefore probably acted true to character during the episode being litigated. [11] Crawford's proposed evidence was prohibited by this rule.

Also, the trial judge ruled that even if it was true that Nicholson had sexually assaulted his ex-wife eleven years before, there was no reasonable connection between (1) the character trait arguably established by that earlier assault and (2) the events that Crawford alleged were occurring in the residence on the night of the homicide. In his brief to this Court, Crawford does not discuss this ruling or attempt to rebut it.

For these reasons, we uphold the trial judge's resolution of this issue.

*The trial judge's refusal to instruct the jury on defense of others*

The trial judge refused Crawford's request to instruct the jury on the defense of "defense of others", *see* AS 11.81.340, and the judge likewise refused to allow Crawford to argue to the jury that he killed Brown while acting in defense of his wife and children.

Crawford's proposed defense is defined in AS 11.81.340. This statute declares that a defendant is justified in using force upon another person "when and to the extent the [defendant] reasonably believe[d] it [was] necessary to defend a third person".

---

[11] *See Howard v. State*, 239 P.3d 426, 430 (Alaska App. 2010).

The statute further explains that this defense is established if, under the circumstances as the defendant reasonably believed them to be, the third person would have been justified in using that same degree of force in self-defense.

Under the self-defense statute, AS 11.81.335, a person is entitled to use deadly force to protect themself from kidnapping. Relying on this provision of the self-defense statute, Crawford argues that there was sufficient evidence to support a jury verdict in his favor on the issue of whether he reasonably believed that his wife and children were in danger of being kidnapped by Brown. Thus, according to Crawford, his wife and children would have been justified in using deadly force against Brown to defend themselves — and, under the "defense of others" provision of AS 11.81.340, Crawford would likewise have been justified in using deadly force against Brown.

But Crawford's theory of imminent kidnapping was not based on any action that Brown took against Crawford's wife and children. Rather, Crawford's theory of imminent kidnapping was based on the fact that Crawford had the keys to the family vehicle on his person. Crawford argued that, because he had the keys, Brown subjected Crawford's wife and children to unlawful restraint when Brown held *Crawford* down on the couch.

The trial judge ruled that this was not a valid theory of kidnapping — and that, in the absence of any other evidence that Brown subjected Crawford's wife and children to a restraint or a threat of restraint, Crawford was not entitled to a jury instruction on "defense of others", nor was Crawford entitled to argue this theory of the case to the jury.

On appeal, Crawford argues that there was some evidence from which the jury could have concluded that he reasonably feared that deadly force was necessary to protect his family from kidnapping. Crawford points to the evidence (1) that Brown assaulted him right after he yelled at his children to get ready to leave the residence;

(2) that Kerri Nichols had lost control of events and could not stop Brown from strangling Crawford; and (3) that Crawford was disoriented and was having difficulty locating his family and assisting them to get in the van so they could leave.

But these assertions, even if true, do not establish a kidnapping as that offense is defined in AS 11.41.300(a).

More importantly, the primary difficulty in Crawford's "defense of others" claim is that, when Crawford testified at trial, he never said that he was afraid his family would be kidnapped. Instead, Crawford testified that Brown strangled him to the point where he was confused and barely conscious — and that, as a consequence, he feared for his *own life*.

On direct examination, Crawford testified:

> *Crawford*: I [saw Brown] coming out, and ... I just remember thinking that, you know, I'm not — I'm not awake. I'm not — I can't stand up. I can't really see things. I can't breathe. And if he gets his hands around my neck again, I'm done [for], and that's probably what he's coming to do.

Crawford gave similar testimony when he was cross-examined by the prosecutor:

> *Crawford*: [T]he door's open, and he's coming out to do me harm, in my mind, because ... I'm outside trying to get away, [and] he [had] just done me harm, [and] he's coming to do it again. Yes. I fired in his direction, and I never consciously acquired him as a target [or] actually saw that happen. I know he was coming at me, and I know I shot in his direction.

For these reasons, we agree with the trial judge that the evidence at Crawford's trial did not support a jury instruction on defense of others.

*The purported error in one of the jury instructions on self-defense*

Crawford argues that one of the jury instructions on self-defense improperly defined the circumstances in which the law would consider his conduct to be reasonable. Here is the instruction in question; we have italicized the portion of the instruction that Crawford objects to:

> When these instructions use the term "reasonable person" or "reasonably believes", they mean a reasonable person not affected by alcohol or drugs, and a reasonable, mentally healthy person whose thinking is not influenced by mental difficulties that skew or affect his ability to form reasonable thought processes or act in a reasonable fashion.

> This does not mean that a person affected by the difficulties listed above may not use force in defense of self, but only that the reasonableness of the person's action must be tested by the standard of what a non-affected person *would have believed* was reasonable under the circumstances.

> Mental difficulties would not include a person's ability to form reasonable thought processes as a result of losing consciousness involuntarily.

At trial, Crawford argued that the second paragraph of this instruction should have asked the jury to determine what a reasonable person *could* have believed was reasonable under the circumstances (as opposed to *would* have believed).

The trial judge ruled that "would" was the proper word, since the "reasonable person" test is an objective one. The judge's ruling conforms to the wording of the self-defense statute, and to the case law interpreting that statute. See, for instance, the Alaska Supreme Court's description of the test in *Weston v. State*, 682 P.2d 1119, 1121 (Alaska 1984): to be justified in using deadly force in self-defense, a defendant

– 41 –                                                                 2432

must have actually believed that deadly force was necessary to protect himself, and the defendant's belief "must be one that a reasonable person *would have held* under the circumstances". (Emphasis added)

On appeal, Crawford does not actually renew his challenge to the wording of the instruction. Instead, he raises a related but different argument: he contends that the prosecutor mischaracterized the law of self-defense in his summation — by telling the jury that, for a killing to be justified based on self-defense, "the defendant must actually believe that there was imminent use of unlawful force against him" and "the reasonable person must reach the same conclusion."

Crawford argues that the prosecutor's formulation was wrong — that the real question is whether a reasonable person *could* have reached the same conclusion.

Crawford did not object to the prosecutor's argument at the time, so his claim is not preserved. Moreover, the prosecutor was merely paraphrasing the law stated in the jury instruction. And to the extent that the prosecutor's wording might have suggested something slightly different from the test contained in the jury instructions, we note that the jurors were told that, regardless of the arguments of counsel, they were required to decide the case in conformity with the court's instructions. [12]

For these reasons, we reject Crawford's claim of error.

*Crawford's claim that the trial judge improperly restricted his <u>voir dire</u> examination of the prospective jurors*

Crawford argues that the trial judge impermissibly restricted his *voir dire* of the prospective jurors regarding their potential bias against individuals who habitually

---

[12]   Jury Instruction No. 50 told the jurors that "arguments of counsel, if they depart from the facts or from the law, should be disregarded."

carry guns for self-defense outside the home. This issue arose when, during *voir dire*, Crawford asked one of the jurors:

> *Crawford*: So if you heard evidence that I carried a firearm, and it had a high capacity magazine, and I'm not in law enforcement, I wasn't at the shooting range, I was carrying it for my own personal protection and that of my family, with no permit, would that give you some pause — [would it make you feel] some possible prejudice?

The prosecutor objected to Crawford's question, and the judge sustained the objection:

> *The Court*: [T]here's no way a juror can answer that fairly without hearing all the evidence ... in the case. And you're asking them to prejudge the facts [of] the case, and that's not permitted.

After the judge issued this ruling, Crawford continued to question the prospective jurors about how they felt in general about people carrying guns, particularly guns with high-capacity magazines.

When the judge later asked the parties if they had any challenges for cause, Crawford complained that, because the judge had restricted his *voir dire*, he had not developed an adequate record to support a challenge for cause — but that, in any event, he would offer challenges to four jurors (Jurors Sa., C., Sw., and W.), and "maybe [Juror L.]".

In response to Crawford's complaint about the earlier ruling, the judge clarified (at some length) that Crawford was only restricted from asking questions that invited the jurors to prejudge the facts of the case — and that there was a "long line" of other questions that Crawford was free to ask (when *voir dire* continued) to elicit any bias that the prospective jurors might have about guns or people who carry them.

The judge denied Crawford's challenges for cause — but Crawford does not challenge those rulings on appeal.

Crawford then used peremptory challenges to excuse all but one of the jurors who had caused him concern.

(The unchallenged juror was Juror L.. During jury selection, Juror L. stated: "I question the reason for high-capacity magazines in places other than [firing] ranges or, you know, battle zones. But they're legal to own and ... anybody having one, I would not hold it against them.")

Crawford does not claim any error in the continued *voir dire* that resumed the following week.

A trial judge has broad discretion to determine the scope of questioning on *voir dire,* [13] and questions that invite the prospective jurors to prejudge the facts of the case are not proper. Moreover, it is unclear what prejudice Crawford is now asserting from the trial judge's refusal to let him ask the question we quoted above. Crawford used peremptory challenges to excuse all but one of the jurors that expressed any concern about gun ownership, and the juror that Crawford did not challenge (Juror L.) stated that he "would not hold it against [a person]" if the person carried a gun with a high-capacity magazine. We note that Crawford does not argue that he was left with an insufficient number of peremptory challenges when *voir dire* resumed.

The test for determining whether a *voir dire* examination was adequate to detect juror bias is whether, "considering the totality of the questions permitted, ... counsel gain[ed] enough specific information to intelligently exercise challenges for

---

[13]   *Bachner v. Pearson*, 479 P.2d 319, 335 (Alaska 1970).

cause and enough general information to exercise peremptory challenges." [14] The *voir dire* in Crawford's case, viewed as a whole, demonstrates that Crawford had enough information about the prospective jurors' attitudes toward guns to intelligently exercise his challenges for cause and his peremptory challenges.

For these reasons, we reject Crawford's argument that the trial judge improperly restricted his *voir dire*.

*The trial court's decision to admit evidence that Crawford had several firearms in his vehicle*

At trial, the State wished to introduce evidence that Crawford was carrying two guns, and that he had several other guns in his vehicle at the time of the homicide. (All told, the State ultimately introduced evidence of six handguns, as well as photographs of long guns.)

Crawford objected to this proposed evidence, arguing that the only relevant gun was the one that he used when he shot Brown. With particular regard to the guns in his vehicle, Crawford asserted that these guns were in the vehicle only because he had packed the vehicle with belongings in anticipation of his impending move to Fairbanks.

But the prosecutor pointed out that Crawford's wife had testified that, after Crawford transported his family to Fairbanks, he intended to return to Anchorage to kill the people who he believed had molested his children. The prosecutor argued that Crawford's possession of so many guns (both on his person and in his vehicle) was relevant to the question of his homicidal state of mind — even if Brown and the other people in the apartment that night were not Crawford's original targets.

---

[14] *Bolhouse v. State*, 687 P.2d 1166, 1172 (Alaska App. 1984); *see also Evans v. State*, unpublished, 1994 WL 16196663, at *1 (Alaska App. 1994).

The trial judge allowed the State to introduce the evidence of Crawford's guns. The judge concluded that it was up to the jury to decide what inference, if any, should be drawn from Crawford's possession of all these weapons, and each party could therefore argue their theory of the evidence to the jury.

Having reviewed the record, we conclude that the judge's ruling with respect to the guns on Crawford's person was not an abuse of discretion, but the admission of the evidence pertaining to the guns in Crawford's vehicle presents a closer question. Nevertheless, we conclude that even if the judge's ruling on this latter point was error, Crawford has not shown that the judge's decision unfairly prejudiced Crawford's defense.

We note in particular that, during the defense case, Crawford testified about his longstanding interest in guns, and the fact that he had habitually carried a gun since he was twenty-one years old. Crawford also elicited his wife's testimony that she was the owner of two of the handguns seized by the police, and that the boxes of guns and firearm accessories found in their vehicle had recently been purchased by Crawford and herself — some to sell at gun shows, and others to keep. Crawford's wife also testified (during the State's case-in-chief) that she and Crawford had been packing up to move to Fairbanks in the days preceding the shooting.

The prosecutor, in summation, argued that Crawford's homicidal state of mind was revealed by the guns that Crawford was carrying *on his person*, as well as Crawford's belief that his children were being molested. The prosecutor argued that even if Crawford somehow believed that it was necessary for him to shoot Brown to protect himself, that belief was not reasonable because Crawford was "armed to the teeth" — a reference to the guns in Crawford's immediate possession.

In sum, we conclude (1) that the evidence pertaining to the guns that Crawford was carrying on his person was relevant to the issues before the jury; (2) that

the evidence pertaining to the other guns in the vehicle presents a closer question; but (3) Crawford was given a fair opportunity to offer testimony to explain his possession of these numerous firearms; and (4) the prosecutor made a legitimate argument as to why Crawford's possession of the weapons on his person was relevant to the question of whether Crawford reasonably believed that it was necessary to shoot Brown.

We therefore hold that any error in the trial judge's ruling was harmless.


*The trial judge's rulings that two of Crawford's young children were not competent to testify*


Under Alaska Evidence Rule 601, all persons are presumed to be competent to testify as witnesses unless the court affirmatively finds either (1) "[that] the proposed witness is incapable of communicating concerning the matter [at issue] so as to be understood by the court and jury", or (2) "[that] the proposed witness is incapable of understanding the duty of a witness to tell the truth."

In the context of a young child, our supreme court has said that this rule requires a judge to "ascertain that the child is capable of receiving just impressions of the facts of which he or she is to testify[,] and [is capable] of relating them truly, in addition to understanding the necessity of testifying truthfully." *Sevier v. State*, 614 P.2d 791, 794 (Alaska 1980).

It is important to note that both Evidence Rule 601 and the *Sevier* decision speak of a child's *capacity* to testify about events. Evidence Rule 601 does not require — or allow — a judge to rule that a proposed witness is incompetent based on the judge's conclusion that the witness is *unwilling* to testify about events.

Before Crawford's trial, the trial judge interviewed all three of Crawford's young sons — Kenneth (age six), Joseph (age five), and Alex (age four) — to determine

whether they were competent to testify. Ultimately, the judge ruled that only the eldest child, Kenneth, was competent to testify.

Following this ruling, Crawford told the judge he was considering filing a petition for review, or a motion for reconsideration of the judge's decision. In response, the judge told Crawford that he would not reconsider his ruling with respect to the four-year-old, Alex, because he was "just too young to understand [the role of a witness], and [he] gets confused".

However, the judge told Crawford that he was willing to interview the five-year-old middle child, Joseph, one more time just before trial, and then reconsider the issue of Joseph's competency. Crawford agreed to this suggestion.

Later, when Crawford reminded the trial judge that he had agreed to reassess Joseph's competency, Crawford made no mention of having the judge interview four-year-old Alex again. And when the judge conducted his second interview with Joseph, Crawford made no request to have the judge reconsider his earlier ruling that Alex was not competent to testify.

For these reasons, we conclude that Crawford abandoned any objection to the judge's ruling with respect to Alex, and we therefore turn to the judge's ruling with respect to Joseph.

During the second competency interview with Joseph (which took place during Crawford's trial), both the trial judge and Crawford himself asked Joseph a number of questions in an attempt to assess the boy's competency. Joseph answered most (but not all) of these questions. But with very few exceptions, Joseph's answers were monosyllabic "yes" and "no" answers. Joseph gave his longest answer — "I didn't want to" — when Crawford asked Joseph if he had earlier expressed willingness to "[talk] on a camera".

At the conclusion of this second interview, the trial judge found (and Joseph's answers demonstrate) that Joseph understood the difference between the truth and a lie — although we note that the trial judge never made a finding on the separate issue that is crucial for purposes of Evidence Rule 601: whether Joseph understood the *duty* to tell the truth.

But despite the fact that the judge was satisfied of Joseph's ability to distinguish the truth from a lie, the trial judge again ruled that Joseph was not competent to testify. The trial judge stated, "I don't have ... confidence that, when [Joseph] is communicating with us, ... he is telling us ... everything that might be there, or even [that he] is going to be answering the questions [at all]."

Crawford challenges this ruling on appeal.

We acknowledge that the trial judge's ruling on this issue is problematic. It appears that the judge ruled that Joseph was incompetent, not because the boy was *unable* to meaningfully communicate his knowledge to the court and jury, but rather because he was *unwilling* to communicate his knowledge to the court and jury. Here are more details of what the judge said:

> *The Court*: Joey didn't want to talk, and he chooses not to talk even though he can answer. I don't think it's anything about capability. [And] I don't think — as ... I said before, I don't think [he's] [un]able to understand the difference between the truth and a lie. ... [H]e's a smart kid. But [whether he is] shy, [or] whatever the case may be, he just doesn't want to answer the questions. ... His choice, basically, is he doesn't [want to] say anything.
>
> . . .
>
> So ... I cannot find that he would be competent to testify before the jury. ... I don't feel confident that he will

be confident [enough] to testify in front of a jury, whether we do it [via] closed circuit TV or not.

As we have explained, Evidence Rule 601 speaks of a witness's *capacity* to answer questions in a manner that allows the court and the jury to understand the witness's answers; the rule does not speak of a witness's *willingness* to answer questions. Indeed, there are many witnesses who, for one reason or another, are unwilling to answer the questions posed to them. This does not make them incompetent to be witnesses.

Even though the *Sevier* decision declares that trial judges have "great discretion in determining the competency of a child to testify", [15] judges must apply the correct legal test for competency when they make this determination. Here, Crawford's trial judge expressly found that Joseph's failure to meaningfully communicate was the result of his unwillingness, not any incapacity.

We therefore conclude that the judge's ruling was error. However, we also conclude that this error was harmless.

As we have explained, Crawford's defense to the homicide charge hinged on the assertion that the victim, Brown, choked Crawford to the point where Crawford lost his normal mental capacity, and then Crawford shot Brown a few minutes later in a state of mental confusion.

Crawford's assertion that Brown choked him was corroborated by the testimony of Crawford's wife, Marie Huesties, and his oldest son, Kenneth Crawford.

Huesties (testifying for the State) told the jury that Brown and her husband got into an argument in the living room while their three sons (Kenneth, Joseph, and Alex) were playing in a bedroom. In the middle of this argument, Crawford yelled, "We're going to leave," so Huesties went to the bedroom to get the three children.

---

[15] *Sevier*, 614 P.2d at 794.

While Huesties was helping the children put on their coats and boots, Huesties could hear some kind of altercation going on in the living room, with Kerri Nichols screaming at Brown. Huesties testified that she hesitated to take the children into the living room, because she was scared. But she finally took their hands and led them outside the house — going through the living room on their way out. According to Huesties, as they passed through the living room, she saw Brown holding Crawford by the coat and "jerking him around" by the collar. Crawford wasn't doing anything in response: his arms were by his side, his eyes were half-open, and he looked "out".

Huesties testified that the children were crying as she led them outside to the car. When they reached the car, Huesties realized that it was locked, and that Crawford had the keys. Crawford came out of the house a few moments later and unlocked the car. Huesties testified that Crawford did not sound like himself. Then someone came out of the house and yelled, "Hey, don't forget ... " — at which point, Crawford pulled a gun and started shooting. Crawford paused, and then he started shooting again. When Crawford was done shooting, they all piled into the van, and Crawford drove away.

Kenneth Crawford (testifying for the defense) corroborated his mother's account of these events (as just described), except that he was more emphatic about Crawford's being choked. Kenneth testified that when he and his two brothers and his mother passed through the living room on their way out of the house, Brown was not just holding Crawford by the collar; rather, Brown was actively choking Crawford — both with his hands and with the crook of his arm.

Given this testimony, and given the fact that Crawford made no offer of proof that Joseph could add anything of substance to the testimony given by his mother and his brother, we conclude that even if the trial judge should have allowed Joseph to take the stand during the defense case, that error was harmless.

2432

In a separate but related argument, Crawford argues that the trial judge's ruling on Joseph's competence was improperly motivated by a desire to save the court system the expense of bringing Joseph to court. But at the time of the judge's ruling, Joseph was already in Anchorage and was available to testify. There was no money at stake.

*Should the trial judge have recused himself?*

Before trial, Crawford asked Superior Court Judge Eric Aarseth to recuse himself, arguing that the judge had displayed actual bias against Crawford or, at least, an appearance of bias. Judge Aarseth denied Crawford's motion, and Judge Aarseth's decision was immediately reviewed by Superior Court Judge Philip Volland. [16] Judge Volland upheld Judge Aarseth's decision, and thus Judge Aarseth remained Crawford's trial judge.

On appeal, Crawford renews his contention that Judge Aarseth should have recused himself. He argues that Judge Aarseth consistently violated his constitutional rights and exhibited "a demeanor that [was] the epitome of arbitrariness and capriciousness." More specifically, Crawford asserts that Judge Aarseth "attack[ed]" him when he inquired into jurors' specific prejudices during *voir dire*, and he "exploded into angry yelling" when Crawford complained that his standby counsel had failed to subpoena his witnesses.

Under AS 22.20.020(a)(9), a judge is forbidden from acting in any matter "in which ... the [judge] feels that, for any reason, a fair and impartial decision cannot be given." In addition, Canon 3E(1) of the Alaska Code of Judicial Conduct requires judges

---

[16] This interlocutory review by a second judge is expressly required by AS 22.20.022(c).

to disqualify themselves in "[any] proceeding in which the judge's impartiality might reasonably be questioned".

As this Court explained in *Phillips v. State*, 271 P.3d 457, 466-67 (Alaska App. 2012), Alaska case law and statutory law is conflicting on whether a judge can be removed from a case against their will on this second ground, "appearance of impropriety". But as we did in *Phillips*, we will decide Crawford's case under the assumption that Alaska law mandates disqualification of a judge when the circumstances give rise to a reasonable appearance of bias, even when there is no proof that the judge is actually biased.

As to what sort of appearance of bias will require a judge's disqualification, we note that the Comment to Alaska Judicial Canon 2A declares that the test is "whether the [judge's] conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality, and competence is impaired." [17]

Although Alaska Judicial Canon 3(B)(4) requires judges to be "patient, dignified, and courteous to litigants", judges are generally not required to remove themselves from a case simply because they have made remarks that are critical of, or even hostile to, an attorney or a litigant. [18] Moreover, a judge's adverse rulings are not a ground for disqualification unless the party moving for disqualification shows that the judge's rulings were the result of personal bias developed from a non-judicial source. [19]

---

[17] Quoted and applied in *State v. Dussault*, 245 P.3d 436, 442 (Alaska App. 2011).

[18] *Hanson v. Hanson*, 36 P.3d 1181, 1183-87 (Alaska 2001) (relying upon and quoting *Liteky v. United States*, 510 U.S. 540, 555-56; 114 S.Ct. 1147, 1157; 127 L.Ed.2d 474 (1994)).

[19] *Nelson v. Jones*, 781 P.2d 964, 972 (Alaska 1989).

Crawford claims that Judge Aarseth verbally attacked him during jury selection. The record does not support this claim. Crawford also asserts that the judge called him "selfish", and that the judge declared that Crawford had a "mental defect" and a "borderline mental illness". But the transcript shows that the judge did not say these things; these are Crawford's personal interpretations of the judge's remarks.

It is true that, in one pre-trial hearing, when Crawford complained that his standby counsel had refused to issue subpoenas for certain defense witnesses that Crawford wanted, Judge Aarseth apparently lost his temper and raised his voice when Crawford refused to accept the judge's resolution of this issue. But this exchange took place outside the presence of the jury and, while it demonstrated the judge's frustration, it did not establish that the judge had a personal bias against Crawford arising from a non-judicial source.

We acknowledge that, at times, Judge Aarseth gave the appearance of being hostile toward Crawford's decision to proceed *pro se*. The judge repeatedly expressed his displeasure with this decision, up until the point where the judge ruled that Crawford was not competent to represent himself — a ruling that this Court overturned on petition for review. But Crawford has failed to establish that the judge acted from any personal bias, or that the judge's statements and actions on this issue gave rise to an appearance of bias that warranted Judge Aarseth's disqualification from Crawford's case.

*Crawford's post-verdict motion for a new trial*

On May 9, 2010 — three months after the jury found Crawford guilty of second-degree murder and various other offenses — Crawford filed a motion for a new trial. In his motion, Crawford alleged that he was entitled to a new trial on five grounds.

These five grounds were: (1) that Crawford was unable to adequately prepare his defense to the charges without the assistance of expert witnesses and an investigator (at public expense); (2) that the judge should have required Trevon Brown to appear as a witness at trial; (3) that the judge erred when he found that two of Crawford's sons, Joseph and Alexander, were not competent to be witnesses; (4) that when Crawford called Kerri Nichols and Darryl Nicholson as witnesses in the defense case, the judge should not have restricted Crawford's direct examination of these witnesses by forbidding Crawford from raising topics that he might have raised when he cross-examined these witnesses during the State's case-in-chief; and (5) that the judge erred when he declined to instruct the jury that Crawford's shooting of Brown was potentially justified as an act taken in "defense of others" (under the theory that Crawford was protecting his wife and children from kidnapping).

But each of these grounds had already been litigated and resolved against Crawford. In essence, Crawford was simply asking the trial judge to reconsider his earlier rulings on these issues and to reverse himself.

Crawford's motion faced another legal hurdle: it was untimely. Alaska Criminal Rule 33(c) provides that any motion for a new trial based on grounds other than newly discovered evidence "shall be made within 5 days after [the] verdict or finding of guilt". Just after the jury returned its verdicts on February 8, 2010, Judge Aarseth expressly informed Crawford of the five-day time limit imposed by Rule 33(c).

When Crawford filed his motion, he asked the trial judge to relax the filing deadline and accept the late-filed motion. Crawford blamed the three-month delay on his standby counsel. But Crawford discharged his standby attorney at the end of February. The trial judge found that Crawford had failed to show good cause for relaxing the deadline until May.

– 55 –                                                                                                  2432

The trial judge made an alternative ruling on the merits of Crawford's motion. He noted that each of Crawford's points was "thoroughly litigated either before or during [the] trial", and he declared that Crawford's arguments for reconsideration were "unpersuasive".

On appeal, Crawford argues that the judge should have reached the merits of his claims. But as we have just explained, the judge *did* reach the merits of these claims: he declared that he was not convinced by Crawford's arguments on the merits.

Crawford asserts in a conclusory fashion that the judge's view of the merits was wrong. But Crawford does not present any actual argument on these points.

Leaving aside the question of whether Crawford should have received public funding to hire an expert witness (a question that we will address shortly), we have already explained why the trial judge's rulings on Crawford's various issues were either correct or, if incorrect, harmless. We therefore uphold the trial judge's denial of Crawford's motion for a new trial.

*Crawford's claim of cumulative error*

Crawford also raises a claim of cumulative error. That is, he asserts that even if none of his claims of error is sufficient, standing alone, to justify a new trial, this Court should nevertheless order a new trial because of the cumulative effect of the various errors that Crawford has identified.

As we have explained in earlier decisions, a claim of cumulative error is really a claim of cumulative prejudice: this doctrine applies in cases where the total

impact of the errors at trial "is so prejudicial that the defendant was deprived of a fair trial, even if each individual error was harmless." [20]

Here, we have concluded that many of the alleged errors identified by Crawford were not errors at all. And with respect to the true errors that Crawford has identified, we conclude that those errors, even in combination, did not result in recognizable prejudice to Crawford. We therefore reject Crawford's claim of cumulative error.

### *The trial court's refusal to provide public funds for Crawford to obtain the services of an expert witness*

This leaves one remaining issue: whether the trial court committed error when it rejected Crawford's request for public funds to hire an expert witness.

Central to Crawford's defense was his claim that, just prior to the shooting, the victim (Brown) attacked him and strangled him to the point of unconsciousness or semi-consciousness. On appeal, Crawford argues that if he had retained a neurologist or other medical expert, this expert might have testified that strangulation could affect a person's thinking or perception, and this testimony might have helped the jury understand how strangulation could have affected Crawford's perception of the threat Brown posed. In particular, Crawford argues that this expert testimony would have helped the jury assess the reasonableness of his mistaken belief that he was justified in using deadly force in self-defense.

Crawford argues that, as an indigent defendant, he was entitled to public funds to retain such an expert witness, and that the superior court improperly abridged

---

[20] *Sawyer v. State*, 244 P.3d 1130, 1137-38 (Alaska App. 2011), quoting *Roussel v. State*, 115 P.3d 581, 585 (Alaska App. 2005).

his rights by (1) failing to order the Public Defender Agency or the Office of Public Advocacy to pay for his proposed expert, and (2) ruling that court system funding was not available for this purpose under Alaska Administrative Rule 12(e).

*(a) The underlying court proceedings and rulings*

Early in the proceedings, when Crawford elected to represent himself, he indicated his interest in hiring an investigator to aid his defense. The judge assigned to Crawford's case at that time, Superior Court Judge Michael Spaan, offered the alternative suggestion of appointing standby counsel to assist Crawford. Crawford later peremptorily challenged Judge Spaan, and the case was assigned to Superior Court Judge Patrick McKay.

At a subsequent representation hearing, Judge McKay also proposed assigning standby counsel to assist Crawford with the investigation of the case, as well as to act as Crawford's legal advisor at trial. At this point, Crawford expressed doubt that he would need an investigator; he told Judge McKay, "What I really think would help my case the most ... is a medical expert."

Crawford then asked Judge McKay if the court could appoint an expert at public expense, since Crawford was indigent. In response, Judge McKay issued an order assigning the Office of Public Advocacy "to assist [Crawford] in pre-trial matters including investigation and request for medical expert[,] and to act as stand-by counsel at trial." The judge told Crawford that he could file a motion if the Office of Public Advocacy declined to provide funds for Crawford's expert witness.

After the Office of Public Advocacy learned of its appointment as standby counsel, the agency filed a motion to withdraw. The agency argued that its enabling statute, AS 44.21.410(a)(5), only authorized the agency to represent defendants to the

extent that the defendant was eligible for representation by the Public Defender Agency — and the Public Defender Agency had taken the position that *its* enabling statute, AS 18.85.100(a), did not authorize it to act as standby counsel (*i.e.*, to act as a subordinate legal advisor to a *pro se* defendant).

The Office of Public Advocacy also took the position that, unless Crawford was its client, the agency was not responsible for securing or paying for expert witnesses or an investigator. The agency suggested instead that, if the court could identify a private attorney who was agreeable to acting as Crawford's standby counsel, the court might appoint that attorney under Alaska Administrative Rule 12(e).

After hearing the Office of Public Advocacy's position, Judge McKay allowed the agency to withdraw, and he appointed a private attorney under Administrative Rule 12(e).

At several subsequent pre-trial hearings, Crawford reiterated his desire to retain the services of a medical expert. He told the court that he wanted a medical expert to testify about his mental condition on the night of the homicide — in particular, how his mental state might have been affected if he was choked to the point of unconsciousness.

Judge McKay told Crawford that if he wished to retain an expert at public expense, his standby counsel would have to apply to the court system for the funds. Referring to the provisions of Administrative Rule 12(e)(5)(D)-(E), [21] the judge informed

---

[21] Administrative Rule 12(e)(5)(D)-(E) provides:

(D) Extraordinary expenses will be reimbursed only if prior authority has been obtained from the administrative director, upon recommendation by the assigned trial judge or the presiding judge. The assigned trial judge may recommend extraordinary expenses up to a total amount not to exceed $1,000.00, and the presiding judge may recommend an amount not to exceed an additional $1,500.00. Extraordinary expenses

(continued...)

Crawford that he could only approve up to $1000 for an expert, and that expenses above that amount would have to be approved by persons higher up in the court system.

At a trial call on June 16, 2009, the State complained that it had not received notice of two potential defense experts, "one relating to strangulation, and one relating to child molestation." At a subsequent pre-trial hearing, the State reiterated that if Crawford "intends to call experts for any [purpose], he needs to file the appropriate notice."

On August 3rd, Crawford told the court that his standby counsel was not helping him contact experts, and he asked for more time so he could contact them himself. Judge McKay granted Crawford a three-month continuance — until November 2, 2009 — to allow him to line up his experts. Judge McKay also reminded Crawford that he would have to apply to the administrative director of the court system if the cost of these experts was going to exceed $2500.

(At this same hearing, Judge McKay released Crawford's standby counsel, and the judge later appointed a new attorney to serve as Crawford's standby counsel.)

By the time of the next hearing in Crawford's case, Judge McKay had been re-assigned to the superior court's civil docket, and Superior Court Judge Jack W. Smith

---

[21] (...continued)
exceeding $2,500.00 may be authorized only in extremely complex cases by the administrative director upon the recommendation of the presiding judge. In this paragraph, "extraordinary expenses" are limited to expenses for:
>    (i) Investigation;
>    (ii) Expert witnesses; and
>    (iii) Necessary travel and per diem expenses. Travel and per
>    diem may not exceed the rate authorized for state employees.

(E) If necessary to prevent manifest injustice, the administrative director may authorize payment of compensation or expenses in excess of the amounts allowed under this rule.

was assigned to Crawford's case. In advance of this hearing, Crawford filed a request under Administrative Rule 12(e)(5)(D) for $7500 in court system funds to pay for DNA testing.

Judge Smith denied Crawford's request. He ruled that it was inappropriate to spend court system money under Administrative Rule 12(e) when Crawford was eligible for complete legal representation — either by the Public Defender Agency or the Office of Public Advocacy — under AS 18.85.100(a).

Shortly afterwards, the presiding judge of the Third Judicial District decided that Crawford's case should be re-assigned to Superior Court Judge Eric Aarseth, who had more experience in criminal law.

When the parties assembled in court on November 2, 2009 (at the end of the three-month continuance granted by Judge McKay), Crawford renewed his request for court system funds to pay for DNA testing. Like Judge Smith, Judge Aarseth denied Crawford's request for these funds, but on a different ground: Judge Aarseth concluded that a reasonable defense attorney would not spend money for the proposed DNA testing. Crawford has not challenged that ruling.

Judge Aarseth also observed that, even though Crawford had been given three months to line up his proposed experts, Crawford had not filed any other specific requests for public funds to pay for other experts. Crawford responded that his standby counsel had told him that there was no point in contacting experts if there was no money to pay for them. Crawford's standby counsel then interjected:

> *Standby Counsel*: Judge, if I may. We were in the process of getting experts. Toxicology — this is an expert case. He needs experts to try this case, and the State has eight or ten. And we were in the process of getting experts. I know locally [one] doctor that I was in the process of contacting, and I think that would've been excellent for this

case. However, Judge Smith denied the funding, and once we — Judge McKay, it [seemed], had every intention of providing him with experts, and paying for it. [But] Judge Smith denied his motion for funding for experts. And at that point, I could not, in good faith, you know, tell these experts to look at these reports and, you know, we wanted to retain them. We had no money, we weren't going to be able to retain them. So that's why you don't have any CVs or anything in front of you. And that's the only reason. We were going to do it. ... [T]hat's the only reason why he waived [the three months under Rule 45] since August 3rd. And so another judge comes along and denies it, and he's left high and dry.

*The Court*: Okay. I don't see from the record there was ever a promise there was going to be any funding for experts. [He was given] an opportunity to line up experts, an opportunity to make that application. But the record [currently in front of me] doesn't support that. ... Mr. Crawford was willing to waive time to see if he could get the experts, but there was never a promise to Mr. Crawford that he was going to get the funding. And there is a lack of anything in front of me [to support a request for funds]. I mean, if I'm supposed to [decide] whether a reasonable attorney would hire these experts, there's nothing in front of me [that would allow me] to make that determination, so ...

*Crawford*: I've got it [now]. I brought the ...

*The Court*: Mr. Crawford, ...

*Crawford*: ... exhibits ...

*The Court*: ... I'm telling you what exists right now. Okay?

*Crawford*: Well, I was just — I've got it right now, if you'll let me present it *ex parte*. I mean, I'd rather not explain the whole defense ...

*The Court*: I'm not going to [let you] present it ... *ex parte*.

*Crawford*: Well, ... then I guess I'll have to, you know, show them my whole defense before trial. But if that's what I have to do to show you that I deserve experts, I've got it ...

*The Court*: No, what I'm saying is that [the] time has passed, and that we're moving on to the next stage [of the proceedings]. Okay? There was three months that was given [to you] to do this, and it didn't happen[.]

Later in the hearing, there was continued discussion along these same lines. Judge Aarseth reiterated his ruling that Crawford had had three months to apply for the funding of expert witnesses, and he had failed to do so, and now the time for making those applications had passed. Judge Aarseth pointed out that even if he gave Crawford more time to submit applications for public funding, Crawford would have to line up expert witnesses who would be reasonably available — and then, even if Crawford did that, Judge Aarseth would still have no idea whether the court system would approve funding above $1000.

Later in the hearing, Judge Aarseth presented another rationale for his decision. He declared that he would not revisit Judge Smith's prior ruling that, if Crawford wanted to hire experts at public expense, Crawford would have to accept full legal representation by the Public Defender Agency or the Office of Public Advocacy:

*The Court*: You've got this idea ... that somehow this pot of money is going to be opened up because you've

– 63 –

[chosen to represent yourself].  There is not an unlimited pot of money, and it is protected.  The money that is there in these budgets is argued over every single year.  Nobody ever gets [all] the money that they want, and there is a process that is in place [for deciding how to spend it].  ...

The constitution requires that we have to provide someone an attorney if they can't afford it, and we have to provide some money so they can get their witnesses here.  There's money for investigations.  But ... we have an agency that does that, and they've got the attorneys, and they have to jealously guard that money.  Presumably, they're going to spend that money wisely.  But there is this process that we go through, and the public has some trust that actually we're going to have people that are trained and ... know how to use these experts.  They know how to pick the experts [that] are needed and are relevant.  They know how to prepare the experts.

And, you know, ... there are limitations in terms of how far you can go.  You know, you don't have to accept it, but I'm telling you the ruling's been made there — made by another judge.  I'm not changing that ruling.

Your choice [to waive counsel] is [also] a choice of the budget that you have.  There may be some money to bring [in] a few [of the] witnesses ... you want, but it isn't going to be anywhere near what you want.  Okay?

Thus, Judge Aarseth ruled that when Crawford rejected court-appointed counsel, Crawford also gave up the right to have the government provide the funding for his proposed expert witness.

*(b) A review of the case law on the question of whether indigent defendants who waive the right to court-appointed counsel and choose to proceed in propria persona are nevertheless entitled to public funds to hire expert witnesses*

The government has a limited obligation, under the federal constitution, to provide expert witnesses at public expense for indigent criminal defendants. The seminal case on this point is *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

In *Ake*, the United States Supreme Court held that, when an indigent defendant's sanity is clearly at issue, and will be a significant factor affecting the outcome of the defendant's trial, the due process clause requires the government to provide the defendant with access to a competent psychiatrist (although not necessarily one of the defendant's choosing). [22] The Supreme Court explained that, in such circumstances, a psychiatric evaluation would constitute one of the "basic tools of an adequate defense." [23]

Although *Ake* was a capital case, most of the courts that have considered this issue since 1985 have concluded that the holding in *Ake* applies to non-capital cases, and to non-psychiatric experts. [24]

However, the decision in *Ake* dealt with an indigent defendant who was represented at public expense, and whose court-appointed attorney asked for additional funds to retain the services of a psychiatrist. Thus, the question decided in *Ake* was

---

[22]  470 U.S. at 83, 105 S. Ct. at 1096.

[23]  470 U.S. at 76-77, 105 S. Ct. at 1092-93.

[24]  Cases on this issue are listed in *Moore v. State*, 889 A.2d 325, 337-38 (Md. 2006), and in Wayne R. LaFave, Jerold H. Israel, Nancy J. King, and Orin S. Kerr, *Criminal Procedure* (3rd ed. 2007), §11.2(e), Vol. 3, pp. 645-46, 652-58 & n. 187.

whether the government might sometimes be required to provide more than purely legal assistance to an indigent criminal defendant, when that additional assistance is so important as to constitute one of the "basic tools" of an adequate defense.

Alaska statutory law already guarantees this type of funding to indigent defendants who are represented at public expense. The Public Defender Agency's enabling statute, AS 18.85.100(a), declares that an indigent person charged with a serious crime is entitled to be represented by an attorney "and ... to be provided with the necessary services and facilities of this representation, including investigation and other preparation."

Thus, the real question in Crawford's case is whether the government is required to provide this same funding for investigative services and expert witnesses when an indigent defendant waives legal representation and chooses to proceed *in propria persona*.

As we explained in the preceding section of this opinion, both Judge Smith and Judge Aarseth ruled that an indigent defendant's right to hire expert witnesses at public expense is part and parcel of the defendant's right to *counsel* at public expense — and thus, when a defendant chooses not to be represented by an attorney at public expense, the defendant also gives up the right to demand public funding for ancillary services such as expert witnesses.

Courts from other jurisdictions are split on this issue.

In *People v. Cardenas*, 62 P.3d 621 (Colo. 2002), the Colorado Supreme Court held that a defendant who wanted the state to pay for a private translator was required to accept representation by court-appointed counsel. [25] And in *DeFries v. State*, 597 So.2d 742 (Ala. Crim. App. 1992), the Alabama Court of Criminal Appeals applied

---

[25] *Cardenas*, 62 P.3d at 623.

the same rule to an indigent *pro se* defendant who asked the trial court for funds to hire a private investigator. [26] The trial court refused this request, informing the defendant that investigative services were among the benefits he gave up by electing to proceed *pro se*. [27] The court of criminal appeals upheld the trial court's ruling, concluding that DeFries "knew what he was doing and his choice was made with eyes open." [28]

But several other courts have reached a contrary result.

In *Matter of Cannady*, 600 A.2d 459 (N.J. 1991), an indigent defendant was charged with murdering her live-in boyfriend. Cannady's family hired an attorney to represent her, but the family could not afford to hire an expert on "battered women's syndrome". [29] Cannady's privately retained attorney asked the trial court to compel the Public Defender to pay for the proposed expert, and the trial court granted this motion. [30] The Public Defender then appealed the trial court's decision, arguing that it was only required to pay for such ancillary services if the defendant was represented by the agency. [31]

The New Jersey Supreme Court disagreed:

> New Jersey's policy is to provide counsel for *all* indigent defendants, not just for indigents represented by the [Public Defender]. The [Public Defender] Act's language

---

[26] *DeFries*, 597 So.2d at 744-46.

[27] *Id.* at 746.

[28] *Ibid.* (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279; 63 S. Ct. 236, 242; 87 L. Ed. 268 (1942)).

[29] *Cannady*, 600 A.2d at 459.

[30] *Ibid.*

[31] *Id.* at 459-60.

states that eligibility for [its] services includes not just a defendant's inability to hire private counsel but also a defendant's ability to pay for *all* other necessary expenses of representation. Nowhere in the Act is there a requirement that a defendant obtain legal services from the [Public Defender] before he or she may obtain ancillary services from it. The Legislature intended that a defendant's right to obtain necessary ancillary services for his or her defense depends on the defendant's indigence and not on whether the defendant is represented by outside counsel.

*Cannady*, 600 A.2d at 462.

(The New Jersey court then laid out a framework for implementing this rule, giving the Public Defender substantial discretion to decide what services it would provide to these non-client defendants — essentially, the same discretion the agency would exercise in cases where the defendant was represented by an agency attorney or by a contract attorney employed by the agency.) [32]

*State v. Burns*, 4 P.3d 795 (Utah 2000), was another situation where the defendant's family hired a private attorney to represent the defendant, and then that attorney asked for public funds to hire an expert. The trial court denied this request, holding that defendants were only entitled to such financial assistance if they accepted court-appointed counsel. [33] The Utah Supreme Court reversed. The court interpreted Utah's statutes as giving indigent defendants two discrete rights: the right to counsel at public expense, and the right to state funding for "investigatory and other facilities

---

[32]  *Cannady*, 600 A.2d at 462.

[33]  *Burns*, 4 P.3d at 797.

necessary for a complete defense" — so that the availability of this second type of funding did not hinge on the defendant's acceptance of court-appointed counsel. [34]

In *State v. Wool*, 648 A.2d 655 (Vt. 1994), the Vermont Supreme Court likewise ruled that, under the Vermont statutes, an indigent *pro se* defendant was entitled to investigative and expert witness services at public expense. The trial court in *Wool* had ruled that a defendant was only entitled to those services if they elected court-appointed counsel. [35] But on appeal, the Vermont Supreme Court interpreted Vermont's Public Defender Act as giving defendants the right to such funding, even when the defendant does not accept court-appointed counsel. [36]

The New Mexico Supreme Court reached a similar result in *State v. Brown*, 134 P.3d 753 (N.M. 2006). However, the New Mexico court's ruling was not based on legislative intent, but rather on the inherent authority of courts to protect the rights of indigent defendants.

The defendant in *Brown* was represented by *pro bono* counsel who asked the trial court to order the Public Defender to provide funding for expert witnesses. [37] The trial court denied this request, ruling that the Public Defender's funds were only available to the indigent defendants whom the agency represented. [38] On interlocutory appeal, the New Mexico Court of Appeals agreed that the trial court had no authority to order the Public Defender to pay expert witness fees for indigent

---

[34] *Id.* at 800-01.

[35] *Wool*, 648 A.2d at 659.

[36] *Id.* at 658, 660.

[37] *Brown*, 134 P.3d at 755.

[38] *Ibid.*

defendants who were not represented by the agency.[39]  But the New Mexico Supreme Court reversed, holding that all indigent defendants were constitutionally entitled to public funding for expert witnesses.[40]  The supreme court declared that "the courts are the ultimate guardians of indigent defendants' rights" — and the fact that the New Mexico Legislature had failed to set aside a budget appropriation for this purpose did not prevent the courts from taking action to obtain the funding necessary to protect these defendants' rights.[41]

### (c) A review of the pertinent Alaska statutes and court rule

We now turn to the question of how to interpret Alaska law on this subject.

The Alaska Legislature created the Alaska Public Defender Agency to serve the needs of indigent criminal defendants.  AS 18.85.100(a), the statute that defines an indigent defendant's right to legal representation, declares that an indigent person charged with a serious crime is entitled, not just to legal representation, but also to "the necessary services and facilities of this representation":

> An indigent person who is under formal charge of having committed a serious crime ... is entitled
>
> (1) to be represented ... by an attorney to the same extent as a person retaining an attorney is entitled; and

---

[39]  *Id.* at 756.

[40]  *Id.* at 759.

[41]  *Id.* at 760.

(2) to be provided with the necessary services and facilities of this representation, including investigation and other preparation.

For these purposes, an "indigent person" is defined as a person who does not have the means "to provide for payment of an attorney *and all other necessary expenses of representation* without depriving the party or the party's dependents of food, clothing, or shelter". [42] This means that, even when a person might be able to pay for an attorney (if that were the only expense), the person still qualifies as an "indigent" — that is, still qualifies for the services of the Public Defender Agency — if the person can not also afford the "other necessary expenses of representation". Arguably, these "other necessary expenses" might include the funds to hire an expert witness in a case where expert testimony is needed.

The Alaska Legislature has also created the Office of Public Advocacy to provide legal representation to indigent criminal defendants "who are entitled to representation under AS 18.85.100 and who cannot be represented by the public defender agency because of a conflict of interests." AS 44.21.410(5). This statute does not expressly mention ancillary services. But by implication, they are included — because the legislature's purpose was to have the Office of Public Advocacy substitute fully for the Public Defender Agency in situations where the Public Defender has a conflict.

The Alaska statutes do not expressly address the question of whether the Public Defender Agency's attorney services and its ancillary services are severable. But the wording of AS 18.85.010 suggests that the legislature intended the Public Defender Agency (and the Office of Public Advocacy, in cases of conflicts) to be the sole source

---

[42]   AS 18.85.170(4) (emphasis added).

of funding for the legal services given to indigent defendants — including both the services of attorneys and any required ancillary services.

We note, in particular, the cross-reference between the two subsections of AS 18.85.100(a). Subsection (1) of the statute declares that an indigent criminal defendant is entitled "to be represented ... by an attorney", while subsection (2) declares that the indigent defendant is entitled "to be provided with the necessary [ancillary] services and facilities of *this representation*".

The phrase "this representation" apparently refers back to the attorney services described in subsection (1) of the statute. If so, then the legislature's choice of words suggests that the legislature viewed the two types of services described in AS 18.85.100(a)(1)-(2) as one integrated whole, not separate and severable guarantees of public funding.

When Crawford's case was litigated in the superior court, the court at various times suggested that Alaska Administrative Rule 12(e) might provide an alternative source of funding for *pro se* indigent defendants who wished to retain expert witnesses. But on closer inspection, the language of Administrative Rule 12(e) appears to prohibit this.

Administrative Rule 12(e)(1) requires the Alaska Court System to provide (and pay for) the legal representation and related expenses of any indigent person who, as a matter of law, is entitled to counsel at public expense — but *only* if the court "determines that the appointment [of counsel] is not authorized by AS 18.85.100(a) [the statute defining the scope of the Public Defender Agency's authority to represent indigent persons] or AS 44.21.410 [the statute defining the scope of the Office of Public Advocacy's authority to represent indigent persons]".

In other words, Administrative Rule 12(e) applies only if the Public Defender Agency and the Office of Public Advocacy are *not* authorized to provide the

representation. Thus, by its terms, Administrative Rule 12(e) does not seem to apply to indigent criminal defendants.

If, indeed, the pertinent statutes and court rule do not authorize the expenditure of public funds for indigent *pro se* defendants who wish to hire expert witnesses, the remaining question is whether, despite the lack of statutory authorization, the government of Alaska is nonetheless constitutionally required to provide these ancillary services at public expense to defendants who waive their right to a court-appointed attorney and choose to represent themselves.

In the previous section of this opinion, we noted the judicial split on this issue. Some courts have ruled that these ancillary services are available only to defendants who choose to be represented by court-appointed counsel; other courts have ruled that the two types of services (attorney representation, and the ancillary services of investigators and expert witnesses) are severable, and that indigent defendants are entitled to the ancillary services even if they choose to represent themselves.

But among this latter group of cases, all but one of the courts' rulings hinged on statutory interpretation. These courts construed their statutes to mean that the two types of services were discrete and severable, so that indigent defendants might choose to avail of themselves of attorney services, or ancillary services, or both.

Only one court — the New Mexico Supreme Court in *State v. Brown* — has adopted the view that indigent *pro se* defendants have a constitutional right to obtain investigative and expert witness services at public expense, even though the legislature only intended to provide these services to defendants who accepted court-appointed counsel.

*(d) Why we conclude that we need supplemental briefing on this issue*

As we have described in the preceding sections, courts are split on the question of whether indigent defendants who waive their right to counsel and choose to represent themselves are nevertheless entitled to public funds to hire expert witnesses. The answer to this question hinges on issues of statutory interpretation and, potentially, issues of constitutional law.

This question is a matter of first impression in Alaska, and our resolution of this issue will affect not only Crawford but many other criminal defendants as well. In order to obtain the best input on this question, we conclude that we should solicit supplemental briefs not only from Crawford and the State, but also from our state's two criminal defense agencies, the Public Defender Agency and the Office of Public Advocacy.

We recognize that these two defense agencies conceivably have financial interests that would prevent them from arguing Crawford's side of this question. We therefore direct the agencies to tell us if that is indeed the case. If so, we will then appoint independent counsel to argue Crawford's side.

*Conclusion*

With respect to all of Crawford's claims of error except the superior court's refusal to provide an expert witness at public expense, the judgement of the superior court is AFFIRMED.

With respect to Crawford's claim that he was entitled to public funds to hire an expert witness, even though he declined an attorney at public expense, we will solicit

supplemental briefs from the parties, as well as *amicus curiae* briefs from the Public Defender Agency and the Office of Public Advocacy.

Within 30 days, those two agencies must tell us whether they believe they can ethically brief Crawford's side of this controversy. If neither agency believes that it can do so, this Court will appoint an independent attorney to brief Crawford's position.

Once we have ascertained whether we need to appoint an independent attorney to brief Crawford's position, we will establish a briefing schedule.